## C. C. HARMON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 108657. Promulgated November 18, 1942.

*Harry A. Campbell, Esq., Roger S. Randolph, Esq.,* and *L. Karlton Mosteller, Esq.,* for the petitioner.

*E. G. Sievers, Esq.,* and *L. R. Vanburg, Esq.,* for the respondent.

### OPINION.

SMITH, *Judge:* Our first question is whether the petitioner and his wife, having made a statutory election to come under the Community Property Law of the State of Oklahoma, effective November 1, 1939, are entitled to report separately their respective shares of community income and deductions pertaining thereto for the period November 1 to December 31, 1939.

In the State of Oklahoma, unlike the other community property states, the community property law applies only to husbands and wives who have filed their written election to come under its terms. The pertinent provisions of the community property statutes are found in Title 32, Oklahoma Statutes Annotated, sections 51 to 65, inclusive. Sections 51 and 52 read in part as follows:

Sec. 51. *Community Property Law—Election to Come Under Act.*

This Act shall be available only to and apply only to husbands and wives and to their property for a period of time from the first day of the month in any year subsequent to their filing their written election to come under the terms of this Act until either an absolute decree of divorce is rendered dissolving their marriage, or until the death of one of them. Laws 1939, page 356, Sec. 1.

Sec. 52. *Election to Come Under Act, Form of—Filing.*

The written election to come under the terms of this Act, referred to in Section 1 of this Act, shall be a written instrument signed and acknowledged in duplicate by both husband and wife, stating in substance that they desire to avail themselves of the Act and have same apply to them and to their property on the first day of the next month in any year subsequent to the filing thereof in both the office of the county clerk and the Secretary of State as hereinafter provided. * * * Laws 1939, page 356, Sec. 2.

Sections 53 and 54 provide that all property, both real and personal, of the husband or wife owned or claimed by them before the effective date of the election to come under the terms of the community property law, as provided in section 1, and that acquired afterwards by gift, by division of community property, by devise, or by descent, as also "the increase of all lands thus owned or acquired," shall be their separate property subject to the control of such owner. Section 56 provides in part that:

Sec. 56. *Property Deemed Community or Common Property—Control—Bank Deposits.*

All property acquired by the husband or the wife after the effective date of the election to come under the terms of the Act as provided in Section 1 of this Act, except that which is separate property of either one or the other, shall be deemed the community or common property of the husband and the wife and each, subject to the provisions of this Act, shall be vested with an undivided one-half interest therein. The wife shall have the management and control and may dispose of that portion of the community property consisting of her earnings, all rents, interest, dividends, incomes and other profits for her separate estate and all other community property the title to which stands in her name. The husband shall have the management and control and may dispose of all other community property, * * * Laws 1939, page 357, Sec. 6.

Section 57 provides that the separate property of the spouses and the community property standing in the name of and subject to the management, control, and disposition of each shall be subject to the debts of such spouse but not to the debts of the other. Section 59 provides that either spouse may sell his or her interest in the community property to the other. Section 60 provides that upon the dissolution of the marriage by decree of court the community property shall be divided between the spouses in such proportions as the court shall deem just and equitable. Section 65 provides:

Sec. 65. *Death of Spouse—Administration of Community Property—Interests of Survivor—Homestead.*

Upon the death of the husband or the wife, the surviving spouse shall administer all community property in the same manner and with the same duties, privileges and authority as are vested in a surviving partner to administer and settle the affairs of a partnership upon the death of the other partner, as provided by Section 1197, Oklahoma Statutes 1931; provided that the surviving husband or wife shall not be disqualified from acting as executor or administrator of the estate of the deceased husband or wife; and provided further, that the survivor of the husband or wife shall pay out of the community property, except the homestead and exempt property, all debts of the community, whether created by the husband or the wife; and provided further, that when all debts of the community shall have been fully satisfied the survivor shall transfer and convey to the administrator or executor of the deceased one-half of the community property remaining to be administered and distributed as other property of the estate either subject to the terms of the will of the deceased or under the laws of descent and distribution as the case may be, and thereafter all the interest of the surviving partner in said community property shall be that of a

tenant in common; and provided further, that any interest in a homestead so conveyed shall not be subject to administration under the laws of this state, except in the manner provided by law at the time of the enactment of this Act. Laws 1939, page 300, Sec. 15.

The Oklahoma community property law is said to be patterned after the Texas community property statutes (see Vernon's Civil Statutes of the State of Texas Annotated, Revision of 1925, Title 75, ch. 3) and in some of its provisions bears a close resemblance to the community property law of that state and those of the other community property states. The election provisions contained in section 51 above, however, are not found in the statutes of any other state. It is chiefly in reliance upon this dissimilarity of the state statutes, that is, the election privilege offered by the Oklahoma statutes, that the Commissioner seeks to distinguish this case from such cases as *Poe* v. *Seaborn* (Wash.), 282 U. S. 101; *Hopkins* v. *Bacon* (Tex.), 282 U. S. 122; *Goodell* v. *Koch* (Ariz.), 282 U. S. 118; *Bender* v. *Pfaff* (La.), 282 U. S. 127; and *United States* v. *Malcolm* (Cal.), 282 U. S. 792. The cited cases hold that under the community property laws of the respective states a husband and wife each has a vested one-half interest in the community income which they can each report in his separate income tax return.

The Commissioner terms the statutory election which petitioner and his wife made to come under the Oklahoma community property law an "anticipatory arrangement" such as the Supreme Court held in *Lucas* v. *Earl*, 281 U. S. 111, to be ineffective to shift the tax burden on the husband's earnings to the wife. The Commissioner's position is that the rule of *Poe* v. *Seaborn*, *supra*, is applicable in those states where the community property law is self-operating and not in Oklahoma where the law operates only when invoked by a voluntary agreement between the spouses; that where the community of property is dependent upon such an expressed voluntary agreement the rule of *Lucas* v. *Earl*, *supra*, applies and requires that the income be reported in the return of the spouse who earns it.

This contention, we think, is unsound. In other community property states, such as California and Texas, the community property statutes apply by operation of law and without any voluntary action on the part of the marital community, but they may be modified or avoided by an express agreement or declaration to that effect by the spouses. For purposes of the Federal income tax we can see but little practical difference between a community property law which is operative only when expressly invoked and one which operates unless expressly revoked. Contracts between husbands and wives changing or modifying the operation of the statutory community property laws of the states have been given effect in determining

Federal income tax questions in a number of cases, including *Helvering* v. *Hickman* (Cal.), 70 Fed. (2d) 985; *Sparkman* v. *Commissioner* (Cal.), 112 Fed. (2d) 774; *Martha Locke Shoenhair* (Ariz.), 45 B. T. A. 576; *Frances C. Brooks* (Wash.), 43 B. T. A. 860. Thus, the election is open to the spouses domiciled in those states to have their separate earnings become community income or not, just as it is in the State of Oklahoma.

It seems to us that the argument for bringing this case under the rule of *Lucas* v. *Earl*, *supra*, has been considered and rejected by the Supreme Court in *Poe* v. *Seaborn*, *supra*, where the Court said:

In the *Earl* Case a husband and wife contracted that any property they had or might thereafter acquire in any way, either by earnings (including salaries, fees, etc.), or any rights by contract or otherwise, "shall be treated and considered, and hereby is declared to be received, held, taken, and owned by us as joint tenants. * * *" We held that assuming the validity of the contract under local law, it still remained true that the husband's professional fees, earned in years subsequent to the date of the contract, were his individual income, "derived from salaries, wages, or compensation for personal service," under sections 210, 211, 212 (a) and 213 of the Revenue Act of 1918 (40 Stat. 1062–1065). The very assignment in that case was bottomed on the fact that the earnings would be the husband's property, else there would have been nothing on which it could operate. That case presents quite a different question from this, because here, by law, the earnings are never the property of the husband, but that of the community.

In his brief the Commissioner submits that although the holding in *Hopkins* v. *Bacon*, *supra*, "would appear to be contradictory to the general principle heretofore mentioned [that the owner of property is taxable on all of the income therefrom, *Reinecke* v. *Smith*, 289 U. S. 172; *Blair* v. *Commissioner*, 300 U. S. 5; *Harrison* v. *Schaffner*, 312 U. S. 579; *Helvering* v. *Clifford*, 309 U. S 331], the two principles are compatible since each governs separate and distinct factual situations, and considerations of policy dictated to a great extent the contrary results reached." Admitting the possibility of the contrary or contradictory results suggested (see *Helvering* v. *Hickman*, *supra*),[1] we think that the reconciliation offered leads away from rather than to the respondent's goal. The factual situation here obviously is more like that in *Hopkins* v. *Bacon*, *supra*, than that in any of the cases offered as establishing the opposing principle, since none of the latter cases involved any question of community income or community property rights under state laws. Likewise, any consideration of "policy" that may have prompted the Court in reaching its decision in *Poe* v. *Seaborn*, *supra;* *Hopkins* v. *Bacon*, *supra*, and like cases, must have found root in the community property statutes of

[1] "Whether the *Earl* Case is entirely consistent with the later case of *Poe* v. *Seaborn*, *supra*, we need not inquire, for the later decision is controlling. * * *" [*Helvering* v. *Hickman*, 70 Fed. (2d) 985, 987.]

the states in which they arose, for without those statutes, and even if substantially the same provisions which they contain had been embodied in a private contract between the spouses, a question entirely different from that considered in *Lucas* v. *Earl*, *supra*, would have confronted the Court; namely, whether a husband and wife in a noncommunity property state may by a private contract establish a legally recognized community of property. Assuming, as we may, that the Oklahoma community property law is similar in purpose and effect to the community property law of Texas, on which it was patterned, the same considerations of policy would necessarily govern in determining their effect on Federal taxation.

From its earliest history the law of the community, in some if not all of the sources of its origin, has embodied the concept of a voluntary agreement between the members of the community. For instance, prior to the adoption of the Code Napoleon, by which the law of the community was made a part of the general law of France, the community of property was excluded in some jurisdictions, in which the Roman law prevailed, but might be adopted by contract. In McKay's Community Property, 2d Ed., it is said that:

§ 147. *Contract is the basis of the conventional community.*—* * * A purely conventional community may be formed and may operate in a state or country where marital rights are not regulated by the law of community. It is enough that the law does not in express terms or by implication forbid it. Where the law of the state recognizes community and provides for it, the contract of the spouses need not provide for every legal detail of the association but may leave much to the law and the law will be deemed to be embodied in their contract where it is not in terms excluded. The contract and the law supplement each other and are construed together as though the law were, in terms, written into the contract. But in spite of this co-operation of contract and law, the basis of the association is contractual. In brief, contract forms the basis of that form of the marital property association called the conventional community.

§ 148. *Contract is the basis of the modified legal community.*—The modified legal community like the conventional is based on contract. In a modified legal community the spouses simply agree to some change in the code or statute, and leave the remainder untouched by their contract. In such a case they not merely make their contract with reference to the law but are deemed to incorporate the unchanged provisions of the legal community into their contract, and clearly contract is the legal basis of this form of community.

§ 149. *The sense in which tacit contract is the basis of the legal community.*—* * * And when two marry and one of the known consequences of their marriage in the absence of a contract to the contrary, is the formation of a marital property arrangement called the legal community, they are deemed to agree to that arrangement, just as much as when a modified community is created by a change of some provision of the law, or when a larger measure of change is made by the formation of the conventional community.

\* \* \* \* \* \* \*

§ 158. *The doctrine in the common-law states.*—Common law and common sense recognize the distinction between casting a system of legal rights and obligations upon persons, and offering them that system to be accepted or

rejected. The law of community in these seven common-law states is not cast upon the spouses; it is offered to them and their acceptance of it is proven by the absence of a contract excluding or modifying it.

The present Civil Code of Louisiana, article 2807, provides that "The community of property, created by marriage * * * is the effect of a contract."

In states where the community property law is self-operating a marriage, in itself, is a voluntary contract or "anticipatory arrangement" by which the contracting parties agree that their separate earnings shall become community income. This might be said also of an agreement between the spouses to move their domicile from a noncommunity property state to a community property state, with the intention of coming under the community property law of the new domicile. We are told that the avowed purpose of the enactment of the Oklahoma community property law was to prevent the exodus of wealthy citizens of that state to Texas and other community property states where they might obtain a tax benefit from the community property laws. Nevertheless the right of husband and wife to file separate returns dividing the community income and deductions in the state of the new domicile is not denied to them.

We think that in his present contention the respondent fails to make a necessary distinction between agreements or assignments of a strictly private character, like that involved in *Lucas* v. *Earl, supra,* and a public declaration or "election" to come under the general community property law of the State of Oklahoma. Such an election is more than a mere assignment of earnings; it is a permanent, irrevocable change in the property rights of the spouses as to all future earnings of both during the continuance of the marital status. These property rights are thereafter determined not by any provisions of the election itself, but by the statutory laws of the state.

The respondent further states in his brief that "The identity of the person properly taxable for the income involved in this proceeding is to be determined without regard to the law of the State of Oklahoma." This contention, we think, is contrary to the position taken by the Supreme Court in its consideration of prior community property questions. For instance, in *United States* v. *Robbins,* 269 U. S. 315, the Court, upon examination of the statutory law and decisions of the courts of the State of California, determined that the wife had a mere expectancy in the community property and not a vested interest and that the husband was therefore taxable on all of the community income. In the following year, 1927, the California statutes were amended by the addition of section 161a, defining the interests of husband and wife in the community property as "present, existing and equal interests under the management and control of the

husband." Based on the amended statutes, the Supreme Court held in *United States* v. *Malcolm, supra,* that the wife had such an interest in the community income as to subject her to Federal income tax on her portion thereof.

In *Poe* v. *Seaborn, supra,* the Court said:

The Commissioner concedes that the answer to the question involved in the cause must be found in the provisions of the law of the State, as to a wife's ownership of or interest in community property. What, then, is the law of Washington as to the ownership of community property and of community income including the earnings of the husband's and wife's labor?

*The answer is found in the statutes of the State, and the decisions interpreting them.* [Italics supplied.]

The Court further said, in distinguishing *Lucas* v. *Earl, supra,* "That case presents quite a different question from this, because here, *by law,* the earnings are never the property of the husband, but that of the community." (Italics supplied.) See also *Helvering* v. *Hickman, supra; Sparkman* v. *Commissioner, supra; Van Every* v. *Commissioner,* 108 Fed. (2d) 650; *Martha Locke Shoenhair, supra,* and like cases involving the question of the effect, under state laws, of agreements between husband and wife supplementing or modifying the community property laws of the states.

The respondent further states in his brief that:

Respondent also contends, as hereinafter more fully developed, that since no special reference is made by Congress in the Internal Revenue Code to income which is deemed community property under State law, the well-established rule that "state law may control only when the federal taxing act by express language or necessary implication, makes its own operation dependent upon state law," is applicable as to the taxability of Oklahoma community income. *Burnet* v. *Harmel,* 287 U. S. 103. This rule was repeated in *Palmer* v. *Bender,* 287 U. S. 551; *Thomas* v. *Perkins,* 301 U. S. 655; *Biddle* v. *Commissioner,* 302 U. S. 573; and *Morgan* v. *Commissioner,* 309 U. S. 78. It is a rule which makes for uniformity in Federal taxation. * * *

This contention, like much of the other argument contained in the respondent's brief, obviously is directed to the general question of whether the community property laws of the states are to be given effect in determining Federal income tax questions. We deem that question foreclosed by the decisions of the Supreme Court in *Poe* v. *Seaborn, supra,* and other cases discussed above.

A further contention of the respondent is that the husband and wife, after electing to come under the community property law, each continues to enjoy most of the rights of ownership in the income from his separate earnings and from his separate properties and is therefore taxable on such income, notwithstanding that it is labeled community income.

Just what are the essential rights of the individual spouses in the community property? First, all of the property of both husband and

wife is divided into two classes—separate property and community property. All of the separate earnings of the spouses and the income from their separate properties, except the increase of lands separately owned, are community property. The wife has the management and control, and the right to dispose of, that portion of the community property consisting of "her earnings, all rents, interest, dividends, income and other profits for her separate estate and all other community property the title to which stands in her name." (§ 56.) The husband has the management and control and may dispose of all other community property. (§§ 53 to 56, inclusive.) The portion of the community property under management and control of one of the spouses is not subject to the debts and liabilities of the other. (§§ 57 and 58.) Upon separation by court decree, the community property is divided between the parties by the court granting the decree in such proportions as the court deems just and equitable. (§ 60.) Upon the death of either spouse one-half of the community property, after payment of community debts, is administered as a part of the deceased spouse's estate and the other half remains the property of the surviving spouse.

The management and control over community property are not property rights and do not determine the ownership of the property. *Warburton* v. *White*, 176 U. S. 484; *Poe* v. *Seaborn*, *supra*. In all of the community property states the management and control of community property are regulated by statute. In most of the states, including California, Louisiana, New Mexico, and Washington, the husband is given the general management and control of the community property, with limited powers of disposal of all or portions of it. The real property in all of the states is under the management and control of the husband. In Idaho, as in Oklahoma, the wife is given the management and control of her personal earnings and the rents and profits of her separate estate. In Texas, likewise, the wife has the management and control and the power to dispose of her personal earnings, the rents from her personal estate, the interest on her bonds and notes, and the dividends on her stocks. See *Robbins* v. *United States*, 5 Fed. (2d) 690, 695, 696. In Nevada the wife is given the management and control of the earnings and accumulations of herself and her minor children living with her when such earnings and accumulations are used for the care and maintenance of the family. See Nevada Comp. Laws (1929) Hillyer, § 3360.

In its opinion in *Robbins* v. *United States*, *supra*, the lower court made a thorough exposition of the community property laws of the then eight community property states for the purpose of comparing them with the California community property law, particularly with respect to the separate rights of the husband and wife in the community property. The court reached the conclusion that under the California

law the wife acquired rights in the community property equal to or greater than those acquired by wives in some of the other recognized community property states, and that such rights constituted a vested estate. The United States Supreme Court reversed the lower court, principally upon the ground that under the decisions of the Supreme Court of California the wife had no vested estate, but a mere expectancy in the community property which did not materialize until the husband's death. Thereafter, in April 1927, the California statutes were amended to provide that:

§ 161a. Interests in community property. The respective interests of the husband and wife in community property during continuance of the marriage relation are present, existing and equal interests under the management and control of the husband as is provided in sections 172 and 172a of the Civil Code. This section shall be construed as defining the respective interests and rights of husband and wife in community property.

The question of the right of a wife in California to report separately her share of the community income was again presented to the United States Supreme Court in *United States* v. *Malcolm, supra* (1931). Two questions were certified to the Court from the Circuit Court of Appeals for the Ninth Circuit, viz.:

(1) Under the applicable provisions of the Revenue Act of 1928, must the entire community income of a husband and wife domiciled in California be returned and the income tax thereon be paid by the husband?

(2) Has the wife, under section 161a of the Civil Code of California, such an interest in the community income that she should separately report and pay tax on one-half of such income?

In a per curiam opinion, and upon authority of *Poe* v. *Seaborn, supra; Goodell* v. *Koch, supra;* and *Hopkins* v. *Bacon, supra,* the first question was answered "no" and the second "yes." The Court considered the amendatory provisions of the California law (§ 161a above) declaring the wife's interest in the community property to be a "present, existing" interest sufficient to bring the California case under the rule prevailing in the other community property states, without the necessity of any discussion of the property rights comprising that interest, which had remained substantially the same as when the *Robbins* case was decided.

While there are certain differences which might be pointed out between the rights of the spouses in the community property under the California law and under the Oklahoma law, we do not think that they require a different treatment of the community income for the purpose of the Federal income tax. What is of more weight here is that the Oklahoma statutes (§ 56) carry a provision similar to that found in section 161a of the California statutes, that the husband and wife each "shall be vested with an undivided one-half interest" in the community property.

We think that the Oklahoma community property law, once properly invoked by a husband and wife resident in that state, creates in each of the spouses a vested estate in one-half of the community property which must be given recognition for Federal income tax purposes.

The respondent does not make any contention that any of the income here in controversy, as identified in our findings of fact above, was not community income under the Oklahoma statutes. We think that it all was community income. None of it was "separate property" as defined in sections 53 and 54 of the Oklahoma statutes, referred to above. The Supreme Court of the State of Oklahoma, in *Harmon* v. *Oklahoma Tax Commission*, 189 Okla. 475; 118 Pac. (2d) 205, a case involving this petitioner's state income tax liability for the period November 1 to December 31, 1939, has upheld the validity of the community property statutes of the state and has construed them as bringing within the community such items of income of both husband and wife as are in controversy in this proceeding. The law of the State of Oklahoma, as so construed by the highest court of the state, is controlling in this proceeding as to what income is community income and what separate income.

It is settled law in the State of Oklahoma that oil and gas in place do not constitute a part of the realty; that no title therein vests until the oil or gas is reduced to possession; and that all income realized from the sale of oil and gas after election to come under the community property law is community income, even though produced from separately owned property. *Harmon* v. *Oklahoma Tax Commission, supra; Rich* v. *Doneghey*, 71 Okla. 204; 177 Pac. 86; *Alexander* v. *King*, 46 Fed. (2d) 235; certiorari denied, 283 U. S. 845. On the other hand, the profit from the sale, after the election to come under the community property law of the state, of an interest in an oil and gas lease previously owned by one of the spouses is the separate income of such spouse and not community income. *Harmon* v. *Oklahoma Tax Commission, supra.* The stipulation in this proceeding is that both petitioner and his wife during November and December 1939 "received from oil and gas royalties" and "received from oil and gas leases" certain amounts of income from royalties and leases which they had previously acquired with their separate properties. We construe the stipulation to mean that this income was derived from the sale of oil and gas and not from the sale of the royalty interests or leases themselves. As such it was community income and not separate income of the spouses.

The deductions allowable in computing the net income of the community are those incidental to the production of the community gross income, such as expenses, depreciation, interest, and taxes. Each

spouse is chargeable with one-half of the community gross income and is allowed one-half of the available deductions. *Mellie Esperson Stewart*, 35 B. T. A. 406; affd., 95 Fed. (2d) 821.

The respondent has allowed the deduction, either to the petitioner or his wife, of all of the items set forth above in our findings of fact as deductions claimed, except the worthless oil and gas royalties. That question is discussed separately below. It is to be noted, however, that among the community deductions claimed is an item of $30 designated "Charitable contributions of petitioner." This deduction is personal to the petitioner and is in no way related to the production of the community income. It is therefore not an allowable deduction against the community gross income. *Mellie Esperson Stewart, supra.*

The respondent has disallowed all of the deductions claimed, either by petitioner or his wife, on account of worthless oil and gas royalties on the ground that such royalties were not shown to have become worthless in 1939.

An oil and gas royalty interest, such as those here under consideration, is the right to a share of the production, or of the profit from production, of oil and gas received by the owner of the land or the mineral rights therein. See *Curlee* v. *Anderson & Patterson* (Tex. Civ. App.); 235 S. W. 622. It is usually acquired directly from the owner of the land, or from another royalty interest owner. It may run with the land, in perpetuity, or with a lease for a term of years. See *B. G. Adams*, 5 B. T. A. 113; *Roy Nichols*, 14 B. T. A. 1347.

The respondent's contentions are that a royalty interest can not be considered worthless until it has been proven that there is no possibility of obtaining oil or gas production from any of the underlying sedimentary beds which can be reached under standard present day practices of drilling; that there must have been test drillings on the property or in the immediate vicinity down to the bottom of the sedimentary beds, that is, to the granite or other underlying base formation generally recognized as containing no oil or gas. In his brief the respondent states his position as follows:

* * * In other words, respondent's position is bottomed on the fact that the search for oil or gas, by virtue of the nature and occurrence of the subject matter, is uncertain; uncertain because the known-producing sands are not necessarily uniform in occurrence and thickness and may be absent completely in some places because of having pinched out or because of other geologic conditions; and uncertain because it is impossible in advance of drilling to determine the possibilities of finding oil or gas in the lower and deeper sedimentary series.

The respondent goes to considerable length in his brief tracing the history of this question through the various Bureau rulings and decisions of the Board of Tax Appeals and the courts. He urges that the uncertainty and confusion that have long attended the administration of the loss provisions of the act in respect of oil and gas properties be

put at rest by the establishment of a definite principle, such as that which he now offers, for future guidance.

However helpful it might prove, as an administrative aid, to lay down a rule of that sort, we can not go beyond the boundaries set by the statute itself. The deduction allowed by the statute, section 23 (e) of the Revenue Act of 1938, is for "losses sustained during the taxable year." The statute makes no distinction between losses of different types of property. It has been construed as relating generally to "realized losses." *Lucas* v. *American Code Co.*, 280 U. S. 445. In that case the Supreme Court said:

Generally speaking, the income tax law is concerned only with realized losses, * * *. Exception is made, however, in the case of losses which are so reasonably certain in fact and ascertainable in amount as to justify their deduction, in certain circumstances, before they are absolutely realized. * * * The general requirement that losses be deducted in the year in which they are sustained calls for a practical, not a legal, test. * * *

A deductible loss is realized upon the happening of some identifiable event by which the property is rendered worthless. *United States* v. *White Dental Manufacturing Co.*, 274 U. S. 398.

In *Rhodes* v. *Commissioner* (C. C. A., 6th Cir), 100 Fed. (2d) 966, decided January 17, 1939, the court held, reversing the Board, that a deductible loss was sustained on Florida real estate in 1927, when the taxpayer determined that the property was worthless, defaulted on his purchase money notes and taxes, and charged off the cost of the property in his books. The Board had held, sustaining the Commissioner's determination, that the loss deduction should be taken in 1928 when the taxpayer fortuitously sold the property for a consideration of about one-twentieth of the purchase price. In its opinion the court said:

Common sense interpretation is the safest rule to follow in the administration of income tax laws. Gross income and deductions flow from trade, commerce and dealings in property carried on in the ordinary business way and in the determination of taxes men should measure both by ordinary, everyday business standards. Compare *Woolford Realty Co.* v. *Rose, Collector*, 286 U. S. 319, 332, 52 S. Ct. 568, 76 L. Ed. 1128; *United States* v. *Hardy*, 4 Cir., 74 F. 2d 841.

In arriving at losses the taxpayer should determine in the first instance the tax year in which sustained and such deductions should be allowed by the Commissioner of Internal Revenue unless it appears from the facts that the taxpayer was clearly unreasonable and unfair at the time he was compelled to make his decision. Subsequent events may show a taxpayer to have been wrong but these must have been ascertainable by the exercise of ordinary business care and judgment at the time he made his income tax return.

* * * * * * *

The fact that a taxpayer recovers a small part of a loss in a subsequent year does not invalidate it as such when its deduction in the year taken was based on the exercise of reasonable judgment from facts then known. *United States* v. *S. S. White Dental Mfg. Company*, 274 U. S. 398, 403, 47 S. Ct. 598,

71 L. Ed. 1120. Such recovery becomes a part of gross income the year of receipt. *Burnet, Commissioner* v. *Sanford & Brooks Company,* 282 U. S. 359, 367, 51 S. Ct. 150, 75 L. Ed. 383; *Cooper* v. *United States,* 8 Cir., 9 F. 2d. 216.

See also *Bickerstaff* v. *Commissioner,* 128 Fed. (2d) 366, reversing 44 B. T. A. 457.

To say that one class of property, such as shares of stock, becomes worthless when it no longer has sale value and that another, such as oil and gas royalties, does not become worthless, although entirely lacking sale value, if the title to the property is still held by the taxpayer, or if drilling has been made to certain specified depths, or if some other condition has not been met, is to set up a standard not authorized by the law or established by long standing usage. Cf. *W. W. Hoffman,* 40 B. T. A. 459; *Alice V. Gordon,* 46 B. T. A. 1201. In determining a taxpayer's right to a loss deduction on account of any worthless property, all of the various factors bearing on worthlessness must be given their proper weight. An oil and gas royalty interest, we think, like any other type of property, becomes worthless upon the happening of some event which results in the loss of its sale value in the ordinary channels of trade and would cause a prudent and informed business man to eliminate it from the asset side of his balance sheet. This worthlessness may be due to exhaustion of the oil and gas underlying the property, the proven nonexistence of oil or gas, or the mere improbability that oil or gas in profitable quantities will ever be available.

Under one of the Bureau's earliest rulings, O. D. 375, C. B. No. 2 (1920), p. 128, the deduction of losses on account of oil royalties becoming worthless was allowed where "such interests prove worthless, as evidenced by all wells proving dry or failing after producing very small quantities of oil." In 1926 S. M. 5700, C. B. V-1, p. 241, was promulgated, holding that in order for the deduction to be allowable the lease must have expired or been canceled, or the owner must have relinquished or otherwise dispossessed himself of all title to and interest therein during the taxable year. See also I. T. 2289, C. B. V-1 (1926), p. 241, revoking O. D. 375. The Board declined to accept the principle established by S. M. 5700 and adhered generally to the more liberal rule offered in O. D. 375. See *A. L. Huey,* 4 B. T. A. 370; *W. H. Morefield,* 4 B. T. A. 394; *B. G. Adams, supra; C. W. Carey,* 6 B. T. A. 539; *United Oil Co.,* 25 B. T. A. 101. But see *Roy Nichols, supra,* where the Board held that, although certain royalty interests lost their sale value when dry holes were drilled to the Wilcox sand but were still held by the taxpayer, they could not be deducted as a loss in that year.

In 1928 G. C. M. 3890, C. B. VII-1, p. 168, was promulgated, relaxing to some extent the rule established in S. M. 5700 and allowing the

deduction upon proof that there was no oil or gas in the land. The ruling reads in part as follows:

* * * Whether an oil and gas lease and/or royalty right comprehend a present interest or estate in the realty itself or in the oil and gas in place * * * they bear a value in direct relation to the presence of oil and gas in the land in commercial quantities. Where there is no oil or gas in the land, the oil and gas lease and royalty right relate to a nonexistent subject matter and have absolutely no value. It would appear that the right to extract oil and gas, or to share in the same when produced, becomes worthless when the subject matter of the right is found to be nonexistent. It is believed that formal disposal of the valueless interest by sale or relinquishment should not be required as a prerequisite to allowance of a loss. A careful prospect of the entire field which demonstrates that the same is barren of oil in commercial quantities may establish the absolute worthlessness of the investment in an oil and gas lease or royalty right. * * *

In *Chaparral Oil Co.*, 43 B. T. A. 457, the Board held, expressing approval of the above quoted portion of G. C. M. 3890, that the cost of an oil and gas lease was deductible as a loss in 1935 when it was demonstrated by new drillings that the oil under the premises lay structurally below the water line of adjacent producing fields and that the lease was therefore commercially nonproductive and worthless. There had never been any drillings on properties covered by the lease, but this was not considered essential to the establishment of worthlessness. Based on data obtained from drillings on adjacent premises, geologists familiar with the conditions in that area had concluded that there was little probability of profitable production on the premises. The cases principally relied upon by the Board in that case were those dealing with losses generally such as *United States* v. *White Dental Manufacturing Co.*, *supra; Royal Packing Co.* v. *Commissioner* (C. C. A., 3d Cir.), 22 Fed. (2d) 536; *Morton* v. *Commissioner* (C. C. A., 7th Cir.), 112 Fed. (2d) 320; and *Keeney* v. *Commissioner* (C. C. A., 2d Cir.), 116 Fed. (2d) 401, all of which dealt with deductions claimed on account of worthless stock.

In the instant case the preponderance of evidence is that all of the royalty interests in question became worthless in 1939. Dry wells had been drilled, some in 1938 and some in 1939, either on petitioner's properties or nearby premises, to depths below those of the producing wells in the vicinity. Two well qualified geologists testified in this proceeding that in their opinion, based on the stipulated facts and on data made available by drillings on or in the vicinity of the petitioner's properties, and their knowledge of the established geological formations in those areas, there was little prospect by the close of 1939 that oil in commercial quantities would ever be produced from any of petitioner's properties and that each of the petitioner's royalty interests became worthless in 1939 or partly in 1938 and partly in 1939.

On the other hand, two equally well qualified witnesses testified on behalf of the respondent that in their opinions petitioner's royalty interests did not become absolutely worthless in 1939; that they thought it possible that the sedimentary beds beneath the lowest known oil producing formations in those areas might be found to contain oil; and that since, as stipulated, these lower sedimentary beds had not been tested by drillings, the worthlessness of petitioner's royalties had not been proven. On being asked by Government counsel the reason for his opinion that petitioner's royalties were not worthless in 1939, one of the respondent's witnesses replied:

A. Because all of the sedimentary beds that may contain oil and gas adjacent to or underneath these royalties have not been penetrated by the drill.

In the light of the witnesses' interesting and instructive explanations of the geological conditions attending the presence of oil deposits and the ever increasing efficiency of mechanical devices for its extraction, the possibility of the recovery of oil at some time in the future from some of the lower unexplored regions of petitioner's properties may be admitted. We do not think, however, that this mere "possibility" of future production is in itself sufficient to give value to oil royalties which have been condemned as worthless by those engaged in the trade and familiar with the development in those particular areas. In the absence of a clear expression of such an intent by Congress, we do not think that section 23 (e) should be construed as requiring the owner of an oil and gas royalty interest which informed and reputable operators consider unfavorable for development to bear the large expense of drilling a test well, or else to dispose of his royalty for which there is no sale value.

Maps of each of petitioner's royalty interests were submitted in evidence showing the location of the properties in relation to the oil pool, if any, and the completed wells, both dry and producing. These maps show that petitioner's properties for the most part were beyond, or at least on the outer fringe, of the proven productive areas.

The respondent concedes in his brief that "if the Board approves petitioner's approach to the question. * * * several of the royalties are demonstrated to have become worthless in the taxable year." On the evidence of record we have found as a fact that all of the royalties in question became worthless during 1939.

These royalty interests were acquired by the petitioner before November 1, 1939, and were his separate property. The losses were not operating losses but were the losses of petitioner's capital investment in the properties. The Supreme Court of the State of Oklahoma has ruled that the profit from the sale of an oil and gas lease owned by one of the spouses before the effective date of their declaration to come under the community property law of the state is the sepa-

rate income of such spouse and does not go into community income. *Harmon* v. *Oklahoma Tax Commission, supra.* It follows that the loss of such property is the loss of the individual owner and not of the community. Petitioner is therefore entitled to the deduction of the entire amount of such losses in his individual return for 1939.

*Decision will be entered under Rule 50.*