JAMES PETROLEUM CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 39073. Filed June 28, 1955.

*Watson Washburn, Esq.,* for the petitioner.
*Francis J. Butler, Esq.,* for the respondent.

510

TURNER, *Judge:* Petitioner claimed a loss in 1944 on a royalty interest which it was alleged became worthless in that year due to the expiration of petitioner's right to redeem the property under Oklahoma law. The royalty was purchased by petitioner in 1929. In 1930 it was offered for sale at a public auction and was purchased by Grace Gilbreath, who took the property and paid the taxes thereon until 1942, at which time she caused to be served upon all interested parties a "Notice of Application for Tax Deed," pursuant to title 68, section 451, of the Oklahoma Statutes, which provides that a purchaser of real estate at a tax sale may, if no person redeems such lands within 2 years, get a deed for the land, or so much of it as remains unredeemed. The statute provides, however, that before any holder of a certificate of purchase issued at a tax sale shall be entitled to a deed, he shall serve upon the owners a notice, signed by himself, which shall recite the sale of the lands, specify the date of the sale, and notify such person that unless redemption is made within 60 days after service of such notice, a tax deed will be demanded and will issue as provided by law. Until the expiration of the said 60 days, redemption may be made by any person authorized by law to redeem.

It is petitioner's contention that under Oklahoma law the right to redeem its royalty interest did not expire until 1944, and that it, therefore, took the loss in the right year. Respondent, on the other hand, argues that while the general rule regarding losses suffered on a tax sale is that the loss is deductible in the year in which the period of redemption expires, *Derby Realty Corporation*, 35 B. T. A. 335, there is an exception to the general rule, that the loss does not and should not have to wait until the expiration of the right of redemption, where the facts indicate that the property was worthless prior thereto, and cites *Commissioner* v. *Peterman*, 118 F. 2d 973, affirming a Memorandum Opinion of this Court, decided November 27, 1939.

A loss is deductible in the year sustained and the question of when a loss is sustained is a factual one, and the burden of proof is on the petitioner. The failure to redeem may be cogent evidence of both a loss to the taxpayer of his interest in property and the time of such loss, but it is only such evidence when it is likewise demonstrated that the property had value prior to the year in which the expiration of the redemption right occurred. Petitioner argues that its action in spending time and money in a suit against Gilbreath in trying to preserve its title "seems the strongest practical proof that the royalty had value." The difficulty with this argument is that the facts upon which it relies are not disclosed by the record. There is no evidence as to when the purported lawsuit was instituted, when it was settled, or even its pur-

pose; nor has any showing been made that any payment was made for legal services in respect of this royalty interest in 1944, as claimed. The only evidence other than James' testimony to the single fact that there was a lawsuit is the letter from Arrington & Miller, attorneys in Shawnee, Oklahoma, to petitioner's counsel, wherein they refer to a case captioned Gilbreath v. Pouder, et al. This letter was dated April 11, 1944, and bears an undated note beneath the body of the letter written by James, to the effect that the case was disposed of by letting judgment go to Gilbreath and that petitioner was to get a deed for its royalty interest on payment of its pro rata share of past taxes. However, another note on that letter indicates that James was of the opinion that the property was not worth petitioner's part of the taxes because it was "condemned by dry holes." The only evidence of a dry hole being drilled on or near the property was in 1930, but James testified that that hole did not render the property worthless. We thus have no evidence of when the dry holes were drilled which "condemned" the property for oil production. It appears that the property was worthless at the time the redemption right expired, and we lack sufficient information to determine when it lost its value. It may have been in 1944, when petitioner claimed the deduction, or it may have been an earlier year. Such being the state of the record, we must sustain respondent's determination on this issue.

With respect to the Horsting litigation, it is petitioner's contention that the nature of the suit against the Horstings was essentially a suit for an accounting by one joint adventurer against another, which, it argues, is the "classical type of litigation giving rise to a deductible legal expense. *Kornhauser* v. *United States*, 276 U. S. 145." Respondent, on the other hand, contends that the settlement of the lawsuit established petitioner's interest in the Jim Wells properties to its satisfaction, which indicates that this was the principal objective in instituting the lawsuit, and that the petitioner was correct in its original treatment of the expenses as a capital expenditure on its books. Respondent does not contend that so much of the legal expenses as may have been incurred for an accounting are not deductible, nor does petitioner contend that so much of the legal expenses as may have been incurred to defend or perfect title to its property are deductible. The question for decision is accordingly one of fact.

It is rather obvious from the settlement agreement entered into by the parties that the legal expenses incurred in relation to this litigation and settlement are not one or the other of either an accounting or defense of title, but that such fees included payment for services, part of which resulted from petitioner's claim for an accounting and part of which resulted from petitioner's defense of title to its property. Petitioner has made no allocation of the legal expenses. Inasmuch

as it is clear that part of the legal expenses was incurred with respect to the accounting, although the amount thereof has not been shown, we have found as a fact, bearing heavily upon petitioner "whose inexactitude is of his own making," that the deductible legal expenses incurred were $1,179.33. *Cohan* v. *Commissioner*, 39 F. 2d 540.

Petitioner sold the property known as the Cambron lease in 1945 for $111.74, the unadjusted basis of which was $17,945.75. In arriving at its adjusted basis to compute its loss, petitioner deducted from its basis, determined under section 113 (a) of the Internal Revenue Code of 1939, the amount which it had reported as depreciation and depletion for prior years. The respondent does not contest the depreciation allowance of $3,548.76 used by petitioner in adjusting its basis, but contends that petitioner should have used cost depletion rather than percentage depletion during the years that the lease was producing; that such cost depletion which was "allowable" was $12,910.90, as distinguished from the percentage depletion "allowed" of $3,006.47; and that under section 113 (b) of the Code,[2] petitioner's basis is thereby reduced and its loss is $1,375.06, rather than the $11,390.52 claimed by petitioner.

Section 113 (b), *supra*, provides that in determining the gain or loss from the sale or other disposition of property, the basis determined under section 113 (a) shall be adjusted for depletion, to the extent of the amount "allowed" as deductions in computing net income, but shall not be less than the amount "allowable."

The computation of depletion by the cost or unit method necessitates three factors, namely, the basis of the property, the estimated total recoverable units in the property, and the number of units recovered during the taxable year. Petitioner and respondent have no dispute in respect of the basis or the number of units recovered during the taxable year; the controversy arises over the estimated total

---

[2] SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property ; except that—

\* \* \* \* \* \* \*

(b) ADJUSTED BASIS.—The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a), adjusted as hereinafter provided.

(1) GENERAL RULE.—Proper adjustment in respect of the property shall in all cases be made—

\* \* \* \* \* \* \*

(B) In respect of any period since February 28, 1913, for exhaustion, wear and tear, obsolescence, amortization, and depletion, to the extent of the amount—

(i) allowed as deductions in computing net income under this chapter or prior income tax laws, and

(ii) resulting (by reason of the deductions so allowed) in a reduction for any taxable year of the taxpayer's taxes under this chapter (other than subchapter E), subchapter E of chapter 2, or prior income, war-profits, or excess-profits tax laws, but not less than the amount allowable under this chapter or prior income tax laws. \* \* \*

recoverable units in the property. James testified, not in respect to this particular property but with respect to all the various properties petitioner at one time or another acquired, that, on the basis of his examination of such properties when petitioner acquired them, he was of the opinion that petitioner would recover enough oil to make a profit on the whole operation and that the 27½ per cent depletion allowance which petitioner took was as accurate a forecast of the total amount of the depletion needed to restore the capital investments as could have been obtained by any other means. On the basis of this testimony, petitioner, in its brief, argues that since it invested approximately $13,000 in the lease,[3] it follows mathematically that there must have been approximately $47,000 worth of oil under the ground, and based upon the price of oil in 1937, when such estimate was made, this would equal about 35,000 barrels of oil. The difficulty with this argument is that percentage depletion is limited by section 114 (b) of the 1939 Code[4] to 50 per cent of net income, and inasmuch as petitioner apparently had no net income from the property for several of the years in question, no percentage depletion could be or was taken. Aside from illustrating the fallacy of petitioner's argument as to computing the number of barrels of oil in the ground on the basis of percentage depletion, these facts also make it apparent that for at least those years when petitioner was not able to take percentage depletion, cost depletion, regardless of how small, would have been greater. Furthermore, the record indicates that production from the Cambron lease dropped from 5,299 barrels of oil in 1937 to 2,235 barrels for the year 1938. In 1939 production fell to 792 barrels, for the next 3 years it dropped approximately 200 barrels a year, and in 1945 produced only 14 barrels. Thus, the production record of the "several" wells on that lease gave strong indication that those wells were not going to produce 35,000 barrels of oil, nor does peti-

---

[3] Cost of equipment was $4,747.85, to which depletion was not applicable.

[4] SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION.

(a) BASIS FOR DEPRECIATION.—The basis upon which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 113 (b) for the purpose of determining the gain upon the sale or other disposition of such property.

(b) BASIS FOR DEPLETION.—

(1) GENERAL RULE.—The basis upon which depletion is to be allowed in respect of any property shall be the adjusted basis provided in section 113 (b) for the purpose of determining the gain upon the sale or other disposition of such property, except as provided in paragraphs (2), (3), and (4) of this subsection.

 *   *    *    *    *    *

(3) PERCENTAGE DEPLETION FOR OIL AND GAS WELLS.—In the case of oil and gas wells the allowance for depletion under section 23 (m) shall be 27½ per centum of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance under section 23 (m) be less than it would be if computed without reference to this paragraph.

tioner contend otherwise. In the light of such facts, it is obvious that petitioner's original estimate of the oil potentialities of the lease, if it may be said that there was an estimate, was in error and such fact should have been apparent to it in 1939 or 1940. Petitioner, on brief, states that because James "felt that the wells drilled were entirely inadequate to exhaust the property, he made no reestimate of the oil contents" of the lease. We are unable to find in the record any evidence regarding the Cambron lease which would justify the opinion contained in that statement. The bare statement by James that the several wells did not exhaust the oil contents of the lease, without some elaboration as to what facts led him to that conclusion, is insufficient to meet the burden of proof which the petitioner bears. It does not appear to us from the record as a whole that the units of oil in the ground were ever estimated or considered in adopting percentage depletion, but rather that percentage depletion was used as a matter of policy with petitioner, and without regard to the statutory provision that the allowance shall in no case be less than it would be if computed without reference to percentage depletion. Petitioner has offered no evidence of ever having computed its depletion on the cost or unit basis, but on the contrary, freely admits that when depletion was taken, it took percentage depletion exclusively. It is necessary for a taxpayer, using percentage depletion, to also compute depletion by the unit method, for the allowance for depletion shall not be less than depletion shown by unit computation. Sec. 114 (b), *supra*, and see *Producers Oil Corporation*, 43 B. T. A. 9.

Petitioner further argues that respondent has been arbitrary and unreasonable in determining the number of units recoverable from the lease. We do not agree. Respondent in his computation of petitioner's depletion determined that the production from the existing wells completely exhausted the oil under the leased property. In view of the production schedule of the wells and the sale by the petitioner of this lease for $111.74, together with the failure of petitioner to offer any countervailing evidence, it is our opinion that respondent's action was reasonable, and his determination is sustained.

During the period 1946, 1947, and 1948, petitioner allegedly sold 12 oil royalties. Five of these royalty properties had never produced oil, six of them had produced at one time but had since stopped, and one was still producing nominal quantities of oil at the time of its purported sale. Five of the royalties were purportedly sold for $1, one for $2, two for $10, two for $20, one for $28, and one for $40. Petitioner paid an aggregate of $68,951.52 for the 12 properties.

Respondent disallowed the losses claimed by petitioner to have resulted from the alleged sale of these properties on the ground that all the nonproducing royalties were worthless prior to such sale and that

the properties which had once produced were either fully depleted, having exhausted the oil supply on the property, or in the alternative, were like the nonproducing royalties, worthless prior to sale. It is respondent's contention that the repeated drilling of dry holes on or in the immediate vicinity of the nonproducing royalties, and the exhaustion of oil and the abandonment of the wells on the properties that once produced oil, were events which resulted in the loss of the sale value of the royalties in the ordinary channels of trade, which would have caused a prudent and informed business man to eliminate them from the asset side of his balance sheet. *C. C. Harmon*, 1 T. C. 40, reversed on another issue 323 U. S. 44. He further argues that the alleged sale by petitioner of these properties for the nominal sums for which it sold them is indicative of the fact that they were worthless and that petitioner was cognizant of such worthlessness.

Petitioner, on the other hand, claims that all of the 12 properties in question had value at the time of sale, and that the explorations made on the various properties did not exhaust the oil in the case of the once-producing royalties or the possibility of oil on the nonproducing royalties. Petitioner makes the claim that it was in liquidation and that it was because of this that it sold the properties at all and particularly it is why it disposed of them for a nominal sum. We think the fact that the alleged sales were spread over a period of 3 years militates against any inference from other evidence of record that the royalties were disposed of under pressure of time so that their full market value could not be realized. There is nothing in the record which indicates that the amounts received were other than token payments accepted for purposes of claiming loss deductions on the various royalties, and no more. The record of each of the royalty interests indicates numerous dry holes on and near the nonproducing properties, and abandoned wells and dry holes on and near properties that had once produced. Petitioner offered as proof that the properties were not worthless prior to sale evidence that some producing wells were drilled on or near some of these properties after they had been disposed of. The question of the value of oil property revolves not merely on whether oil can be obtained from the property, but whether profitable quantities will ever be available. *Chaparral Oil Co.*, 43 B. T. A. 457; *C. C. Harmon, supra.* There is no evidence that the oil from these wells was available in sufficient quantities to give value to the property, or whether it was merely nominal, as in the case of the wells on these properties for which we do have production records. The fact that the taxpayer, after a clear indication that a property has become worthless, wishes to retain its royalty interest therein in the hope that some income may ultimately be realized from it, does not add value to the property. Assuming, however, that the wells subse-

quently drilled did lend value to the property, it is well recognized that subsequent events may show reasonable business judgments to be inaccurate, *Rhodes* v. *Commissioner*, 100 F. 2d 966; *Chaparral Oil Co.*, *supra*, but the possibility that such events might occur cannot be used as an excuse for refusing to make reasonable judgments according to everyday business standards on the basis of facts presently known. The showing that the properties in question, as well as adjoining properties, have been under lease subsequent to their purported sale by petitioner is likewise not determinative of the value of the property, in the absence of any showing of the value of such leases. The only direct evidence we have of the value of these properties is the price obtained by petitioner for its royalty interest which, as set forth above, was only nominal.

Petitioner relies heavily upon cases to the effect that oil royalties represent interests running with the land and as such retain a potential value until sold or otherwise disposed of, *Roy Nichols*, 14 B. T. A. 1347, 17 B. T. A. 580, except where the taxpayer determines the royalties to be worthless prior to sale, in which case such determination should be sustained unless the taxpayer was clearly unreasonable and unfair in arriving at his decision. *Rhodes* v. *Commissioner*, *supra*. Petitioner argues from these cases that inasmuch as it has not determined the royalties to be worthless and the royalties are interests running with the land, the determinative event of petitioner's sustained loss is the sale of the properties. We have held in the *Harmon* case that oil and gas royalties may become worthless the same as any other class of property "upon the happening of some event which results in the loss of its sale value in the ordinary channels of trade and would cause a prudent and informed business man to eliminate it from the asset side of his balance sheet." The fact that petitioner never determined the royalties to be worthless is immaterial, for the criterion for the deductibility of a loss is not ascertainment but when the loss is sustained. *L. S. McLeod*, 19 B. T. A. 134; *S. G. Armstrong*, 24 B. T. A. 321; *American Multigraph Co.*, 10 B. T. A. 406. On the record before us, there is nothing to show that petitioner did not sustain the losses as a result of the properties having become worthless prior to the taxable years, when the purported sales were made. Petitioner admits on brief that it "followed a consistent policy of not writing off royalties as worthless until sold, even though in the first years of its existence such a practice might have resulted in tax savings." It thus appears that petitioner established for itself a standard of conduct for determining losses contrary to that set forth in section 23 (f) of the 1939 Code. The result of such a policy is obvious, for it ignores the reality of the facts pertaining to the value of the royalties.

We have carefully studied all the evidence with respect to each of petitioner's properties and, with the exception of royalty No. 10, have concluded, for the reasons set forth above, that the respondent did not err in determining that both the nonproducing and once-producing royalties were worthless prior to the year of their purported sale by petitioner.

Royalty No. 10 had an unadjusted basis to petitioner of $12,759.10. There was one well on this property which was evidently drilled in 1928 and which was still producing nominal amounts of oil when it was sold by petitioner in 1948 for $10. The evidence shows petitioner's share of oil production from the property for the years 1928 to 1936, inclusive, was 927.47 barrels, or an average of 103.05 barrels per year; for the years 1937 to 1941, inclusive, was 169.80 barrels, or an average of 33.96 barrels per year; and for the years 1942 to 1948, inclusive, was only 32.77 barrels, or an average of 4.68 barrels per year. Percentage depletion was taken on this royalty interest in the aggregate amount of $196.04. The respondent determined that cost depletion exceeded percentage depletion taken by petitioner by $12,038.57, thus reducing petitioner's loss to $514.49. It is respondent's contention that petitioner's basis on the royalty should have been recovered by depletion prior to sale, his argument as to depletion allowed or allowable being the same as that made with respect to the Cambron lease. It is petitioner's position that there was enough oil under the ground to return its investment through percentage depletion.

As in the Cambron lease issue, there is no evidence that petitioner ever estimated the oil reserves with respect to royalty No. 10, but rather, took percentage depletion as a matter of policy. What we have said in regard to this policy in discussing the Cambron lease issue applies equally here. After giving all the facts with respect to this issue full consideration, particularly the fact that in 14 years of production on this property petitioner recovered less than 2 per cent of its investment therein and the fact that notwithstanding its high appraisal of the oil potential of the property, it sold this royalty interest for $10, we conclude that the respondent did not err in adjusting the basis for royalty interest No. 10, and his determination with respect thereto is sustained.

*Decision will be entered under Rule 50.*