LEFTRIDGE BURDETTE and MADELINE BURDETTE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Burdette v. Commissioner
Docket No. 6953-72.
United States Tax Court
T.C. Memo 1975-130; 1975 Tax Ct. Memo LEXIS 237; 34 T.C.M. (CCH) 610; T.C.M. (RIA) 750130; 51 Oil & Gas Rep. 141; May 7, 1975, Filed John B. Fisher, for the petitioners. Donald W. Mosser, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined a deficiency in the Federal income tax of the petitioners for the taxable year 1970 in the amount of $42,482.03. Some of the issues have been conceded by both parties and the only issue remaining for our decision *238 concerns the proper timing for the deductibility of a loss on the abandonment of an oil well and the accrual of certain intangible drilling costs. FINDINGS OF FACT Many of the facts have been stipulated. The stipulation of facts, the supplemental stipulation of facts, and the exhibits are incorporated by this reference. Petitioners Leftridge and Madeline Burdette are husband and wife and filed their joint Federal income tax return for the taxable year 1970 with the Internal Revenue Service Center, Covington, Kentucky. They resided in Charleston, West Virginia, at the time of the filing of their petition. Leftridge Burdette (hereinafter petitioner) kept his books and records and reported his income for Federal income tax purposes on the accrual basis. He also elected to expense intangible drilling costs. Sec. 263(c), Internal Revenue Code; [1]Sec. 1.612-4, Income Tax Regs.
Petitioner owned and operated a sole proprietorship, the Burdette Asphalt and Paving Co., which entered into a lease agreement with C. W. *239 Kelly, doing business as Kelco Oil Co., on November 16, 1970. The lease provided that for the consideration of $20,000 petitioner received Kelco's right, title and interest in an oil and gas leasehold estate entitling petitioner to drill one well on lands covering 33 acres. On November 17, 1970, petitioner and Ray Resources Corporation entered into a rotary drilling contract whereby Ray Resources was to drill a gas well for petitioner on the leased property. The contract with Ray Resources provided, interalia, that the well was to be drilled to 5,100 feet or 25 feet above the top of the "Newburg Sand" formation and not beyond a maximum depth of 6,000 feet. Petitioner agreed to pay $5.50 per foot of hole drilled on a footage basis, $1,050 per day without drill pipe, $1,150 per day with drill pipe, and $900 per day for standby time. After filing a notice of proposed location with the Oil and Gas Wells Division of the Department of Mines for the State of West Virginia, posting a required bond and receipt of approval, the drilling commenced on December 6, 1970, and terminated on December 14, 1970. This initial drilling activity resulted in no gas production and the total depth *240 drilled was 5,158 feet. The casing and tubing used for the initial drilling activity was as follows: Feet Used Size
in Drilling
13-3/8
95
8-5/8
2112
5-1/2
5063
On December 14, 1970, petitioner filed a "Notice of Intention to Plug and Abandon Well" and a "Well Record" with the Department of Mines. The documents specifically provided that the well was to be "partially plugged" back to the bottom of the 8-5/8 inch pipe, 2112 feet from the surface. In addition, a whipstocking operation was planned at a level of 2,350 feet. The process of whipstocking a well involves changing the direction of drilling from the direction used in the original drilling of the well, such as drilling a slant hole instead of a vertical hole. An affidavit, dated December 16, 1970, verified the partial plugging with cement and jel. All of the 13-3/8 inch casing and 8-5/8 inch casing and 1,336 feet of the 5,063 feet of 5-1/2 inch casing that was used in the original drilling was left in the well. The 1,336 feet of 5-1/2 inch casing was not recoverable due to the cement plugging operation. On December 28, 1970, whipstock drilling commenced at the 2,350 foot level and the original hole *241 and casing were used to that depth. The whipstock hole was terminated at a depth of 5,180 feet about 400 feet northeast of the original hole on January 18, 1971, with the result of no gas production. A notice of intention to plug and abandon the well was filed on January 19, 1971, and plugging of the well was completed on the same date. There were other wells in the general area of petitioner's dry well which were productive. Such wells were sufficiently close to preclude whipstocking in their direction. Petitioner claimed a $141,813.52 loss on the dry well on his 1970 Federal income tax return. The Commissioner, in his notice of deficiency, disallowed $52,853.82 of the claimed loss consisting of $44,082.83 in tangible drilling costs and $8,770.99 in intangible drilling costs. The $44,082.83 of disallowed tangible costs was composed of $20,000 paid under the lease agreement with Kelco and $24,082.83 for pipe billed to petitioner in 1970 as follows: Length
Cost Size
in Feet
Per Foot
Total Cost
5-1/2 inch
3,880.90
$2.0000
$ 7,761.80
5-1/2 inch
3,016.09
2.8513
8,599.78
8-5/8 inch
1,834.83
2.6500
4,862.30
8-5/8 inch
531.83
3.2737
1,741.05
13-3/8 inch
96.08
6.5634
630.61
Misc. Items
487.29
TOTAL
$24,082.83
*242 The $8,770.99 intangible drilling costs disallowed were incurred in 1971 and the estimate of the amount to be incurred was made after the issuance of invoices in 1971. OPINION Petitioners' position is twofold. They urge that the whipstocking operation was not a new operation but an attempt to salvage something from the old well which was abandoned in 1970 entitling petitioner to a loss deduction in 1970. Petitioners draw our attention to Great Western Petroleum Corp.,1 T.C. 624 (1943), and Snider v. Commissioner,453 F.2d 188 (C.A. 5, 1972). Alternatively, petitioner urges that the $20,000 lease was a fixed and liquidated cost and the $24,082.83 of tangible pipe costs and $8,770.99 of intangible costs were susceptible of a reasonably certain estimate under the drilling contract and should therefore be accrued as expenses in 1970. The leasehold clearly being an interest in land is deductible only upon the realization of a loss occasioned by a disposition, forfeiture rf abandonment. See A. J. Schwarzler Co.,3 B.T.A. 535 (1926). In Belridge Oil Co.,11 B.T.A. 127, 137 (1928), we stated that "[whether] or *243 not there has been an abandonment of an oil well depends upon the intention of the owner, coupled with the act of abandonment, both to be ascertained and determined from all the surrounding facts and circumstances." We doubt whether an unequivocal statement of intent to abandon filed with a state regulatory agency, standing alone, carries the burden. Cf. State Co. v. United States, an unreported case ( S.D. Cal. 1944, 34 AFTR 1707, 44-2 USTC par. 9489). Our doubt is quickly resolved here where the statement of intent makes reference to "partial" abandonment coupled with further drilling. The whipstocking operation has been characterized by petitioner as an effort to salvage after abandonment. We agree with the general proposition that the recovery of a small part of a loss in a subsequent year does not obviate the loss as such when its deduction in a prior year was based on the exercise of reasonable judgment from facts then known. United States v. S. S. White Dental Mfg. Co.,274 U.S. 398, 403 (1927). Such a recovery might have been our case if the activities in 1971 were limited to attempts to recover the pipe. Likewise, such an explanation *244 would be more likely if neighboring wells were not productive, Arthur A. Byerlein, 13 T.C. 1085, 1091-1092 (1949), or success in the vicinity was proven to be improbable. C. C. Harmon,1 T.C. 40, 56 (1942); Harvey A. Heller,1 T.C. 222, 224 (1942). We find petitioner's contention of worthlessness to be unpersuasive because he continued to look for oil by the whipstock operation. This is comparable to drilling a separate and distinct second well as in L. M. Fischer,14 T.C. 792, 801 (1950), where we held, as we do here, that the lease was not abandoned in the earlier year. Our consideration now turns to the tangible drilling expenses which are separate from the investment in the leasehold. Although petitioner exercised his option to expense intangible drilling expenses, sec. 263(c), Internal Revenue Code, and sec. 1.612-4, Income Tax Regs., no such option exists with respect to tangible costs which must be capitalized. Harper Oil Co. v. United States,425 F.2d 1335 (C.A. 10, 1970). Therefore, the question is again whether or not petitioner abandoned the oil well and sustained *245 a loss on the tangible costs in 1970. Respondent has resolved the legal question of whether partial abandonment is possible by conceding on brief that 1,336 feet of 5-1/2 inch pipe was abandoned and worthless when it was cemented in the bottom of the well in 1970 prior to whipstocking. Respondent concedes $2,672 as the cost of the pipe cemented and lacking other evidence, we find such amount reasonable. With respect to the other tangible costs, our conclusions regarding the lease are likewise determinative here. Petitioner urges that his accountants were able to determine the intangible costs with reasonable accuracy based upon the drilling contract. Sec. 1.446-1(c)(1)(ii), Income Tax Regs. Initially, we are not convinced that the contract with Ray Resources, dated November 17, 1970, sets forth the information upon which the intangible costs could have been determined. Of the $8,770.99 involved, $3,318 was attributable to Eastman Oil Well Supply for the rental of "certain equipment" which has not been related to the contract in any fashion. Further, the balance, which is attributable to Ray Resources, is based, in part, upon the directional or whipstock drilling which was commenced *246 on December 28, 1970, and continued through January 18, 1971. We do not believe that the additional whipstocking pursued in 1971 could have been estimated with reasonable accuracy when the time generally required for a whipstocking operation, as estimated by petitioner, was only four days and the actual time for drilling this hole required 22 days. It follows that Great Western Petroleum Corp.,1 T.C. 624 (1943), is not controlling because the expenses there were incurred in the prior year, and we do not believe the expenses here could have been determined with reasonable accuracy as required under the accrual method, sec. 1.446-1(c)(1)(ii), Income Tax Regs., which is the effect of granting a deduction for incurring expenses which would otherwise be capitalized. Sec. 1.612-4(d), Income Tax Regs. For the same reasons Snider v. Commissioner,supra, is inapplicable. See also Cold Metal Process Co.,17 T.C. 916, 932-933 (1951). Due to the various concessions, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to sections of the Internal Revenue Code of 1954 in effect during the years in issue, unless otherwise noted.↩