CHAPARRAL OIL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 97552. Promulgated January 30, 1941.

*Harold E. Rorschach, Esq.*, for the petitioner.
*Stanley B. Anderson, Esq.*, for the respondent.

## OPINION.

HILL: Petitioner offered the testimony (by deposition or in person) of five witnesses, all of whom were graduate geologists of long practical experience and were members of the American Association of Petroleum Geologists and the Tulsa Geological Society. Some were also members of other technical organizations. One of these witnesses was a geologist for petitioner, who examined the royalty interest in 1935 and accumulated the data made available by the wells which had been drilled at that time in and around the oil producing area including wells on every side of the leased land and additional data secured from the Kansas Geological Society, which are accepted generally by geologists as authoritative. This data furnished the control for the construction of a development and geological contour map of the oil producing area and of the royalty interest in question as of December 31, 1935. Such a map was drawn by petitioner's geologist, coordinating and demonstrating such controlling data, and was admitted in evidence. He testified to the correctness of the data and to the accuracy of the map constructed therefrom. He also testified that, on the basis of the data secured as a result of the investigation of the royalty interest in 1935, he condemned the royalty interest as worthless and recommended that petitioner charge it off on its books as a loss in that year; that petitioner did so charge it off and took a deduction of such loss in its income tax return for that year, filed March 15, 1936.

Another of such witnesses checked the above described map with information secured independently thereof and testified that it accurately demonstrated the geological structure involved as indicated by known data.

Two of such witnesses based their testimony on the data disclosed by the map, without personal knowledge of such data. The fifth of such witnesses was the chief geologist of the northern division of the Sinclair Prairie Oil Co. He testified, from his own knowledge without reference to the map, as to facts known in 1935 which influenced the Sinclair Co. to decline to renew its lease which expired March 2, 1936.

Concisely stated, the testimony of the geologists was to the effect (1) that a property located on the edge of an oil and gas field will not produce in commercial quantities where it lies structurally below the water line surrounding the field; (2) that a sufficient number of wells had been drilled at the end of 1935 to permit the mapping of the producing oil and gas area and of the property covered by petitioner's royalty interest; and (3) that it was shown by the new developments in the field during 1935 that the west side of the land in which petitioner held its royalty interest is situated about a quarter of a mile to the east of the structure which had trapped the commercial oil pool; that it is on the syncline bordering the east side of the oil producing area and lies below the water line thereof.

Four of such witnesses testified categorically that in their opinion, based on the data reflected on the map, it was demonstrated in 1935 that the property here involved would not produce oil and gas in commercial quantities. The geologist for the Sinclair Co. testified in effect that the reason that company declined to renew its lease on the property was that developments in 1935 demonstrated that the structural axis of the oil pool was west of the previously conceived line thereof, thus showing the leased property to be on the east edge of the pool, and, further, that wells on the east side of the pool were flowing an alarming quantity of water and that there was a dry well on the adjoining section to the east of the leasehold. He also testified that the Sinclair Co. did not have sufficient faith in the property to drill it; that his company tries to "farm out" a lease when it looks so bad geologically that it does not want to drill it itself—just a last desperate effort to get something out of a lease.

While petitioner charged off its investment as a loss during the taxable year, it still retained title to its royalty interest. That fact alone, however, is not sufficient ground to justify denial of the deduction claimed. *A. H. Fell,* 7 B. T. A. 263; *B. G. Adams,* 5 B. T. A. 113.

The rule properly applicable under the present circumstances is well stated, we think, in the following extract quoted from G. C. M. 3890, C. B. VII-1, p. 168:

Whether an oil and gas lease and/or royalty right comprehend a present interest or estate in the realty itself or in the oil and gas in place * * * they bear a value in direct relation to the presence of oil and gas in the land in commercial quantities. Where there is no oil or gas in the land the oil and gas lease and royalty right relate to a nonexistent subject matter and have

absolutely no value. It would appear that the right to extract oil and gas, or to share in the same when produced, becomes worthless when the subject matter of the right is found to be nonexistent. It is believed that formal disposal of the valueless interest by sale or relinquishment should not be required as a prerequisite to allowance of a loss. A careful prospect of the entire field which demonstrates that the same is barren of oil in commercial quantities may establish the absolute worthlessness of the investment in an oil and gas lease or royalty right.

In the light of the new developments in the field during 1935, which clearly established that the land in which petitioner owned a royalty interest was structurally below the water line and thus shut off from any reasonable hope of commercial production, and upon the advice of its consulting geologist, petitioner charged off its investment as worthless in the taxable year. The fact that in the following year, through an unexpected and fortuitous circumstance, it realized rent of $600 and received a small royalty from oil produced, is not in our opinion persuasive evidence that petitioner's royalty interest had not become worthless, for tax purposes, in 1935. Undoubtedly the well drilled by the Shell Co. in 1937 was purely a speculative venture, and its abandonment in 1938, after the production of oil sufficient to repay only a small part of the cost of drilling, demonstrates the practical worthlessness in 1935 of petitioner's interest.

In such circumstances, it is not necessary for a taxpayer to establish complete and total loss beyond the possibility of any recoupment. In *United States* v. *White Dental Manufacturing Co.*, 274 U. S. 398, the taxpayer had an aggregate investment of more than $130,000 in a German subsidiary corporation. In March 1918 a sequestrator appointed by the German Government took over the property of the subsidiary. The taxpayer thereupon charged off as a loss the amount of its investment in the German corporation and in its income tax return for 1918 deducted the amount from gross income. The deduction was disallowed by the Commissioner, solely on the ground that the loss was not evidenced by a closed and completed transaction. In 1922 the taxpayer recovered $6,000 of its investment, which it returned as income. The taxpayer also filed a claim with the Mixed Claims Commission, which in 1924 was allowed to the extent of $70,000. The Supreme Court held that the taxpayer was entitled to the deduction claimed in 1918, saying:

The statute obviously does not contemplate and the regulations * * * forbid the deduction of losses resulting from the mere fluctuation in value of property owned by the taxpayer * * *. But with equal certainty they do contemplate the deduction from gross income of losses, which are fixed by identifiable events, * * * a loss may become complete enough for deduction without the taxpayer's establishing that there is no possibility of an eventual recoupment. It would require a high degree of optimism to discern in the seizure of enemy property by the German government in 1918 more

than a remote hope of ultimate salvage from the wreck of the war. The taxing act does not require the taxpayer to be an incorrigible optimist.

In *Royal Packing Co.* v. *Commissioner* (C. C. A., 9th Cir.), 22 Fed. (2d) 536, the court said:

\* \* \* The taxpayer was not entitled to the deduction merely because the stock may have subsequently become worthless or because, in the light only of subsequent developments, it may appear to have been inherently worthless during the year in question. Nor can the deduction be claimed for a mere shrinkage in value. A loss may be said to be actually sustained in a given year if, within that year, it reasonably appears that such stock has, in fact, become worthless. It is not requisite that there be a charge-off on the books of the taxpayer, and the ultimate fact of worthlessness may be shown by circumstances, as in other cases where that question is in issue. But the burden is on the taxpayer to establish the fact by reasonably convincing evidence. \* \* \*

In *Morton* v. *Commissioner*, 112 Fed. (2d) 320, the court quotes with approval from *Lucas* v. *American Code Co.*, 280 U. S. 445, as follows:

Generally speaking, the income tax law is concerned only with realized loss, \* \* \*. Exception is made, however, in the case of losses which are so reasonably certain in fact and ascertainable in amount as to justify their deduction, in certain circumstances, before they are absolutely realized. \* \* \* The general requirement that losses be deducted in the year in which they are sustained calls for a practical not a legal test.'

The court in the *Morton* case also quotes with approval from *DeLoss* v. *Commissioner*, 28 Fed. (2d) 803, as follows:

True, it was not possible to say beyond imaginable peradventure that these assets might not be snatched at by some impressionable buyer, who did not share their owners' estimate of their value. But any such expectation was plainly illusory \* \* \*. So far as human foresight could go, the shares were worthless \* \* \*. [Citing *United States* v. *White Dental Manufacturing Co., supra; Royal Packing Co.* v. *Commissioner, supra.*]

In *Keeney* v. *Commissioner*, 116 Fed. (2d) 401, the court said:

\* \* \* Nor can he postpone his claim of loss until only an "incorrigible optimist" would fail to know that the stock had become worthless at an earlier date. A finding of worthlessness depends on all the facts of the particular case reasonably leading to that conclusion. \* \* \*

On the basis of facts and circumstances in evidence we hold that petitioner sustained a loss in 1935 in the amount of the cost of its royalty interest and consequently was entitled to take a deduction therefor in its income tax return for that year.

We hold that respondent was in error in disallowing the deduction claimed by petitioner.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

TURNER, ARNOLD, DISNEY, and KERN dissent.