Arthur Finston and Renee Finston v. Commissioner.
Finston v. Commissioner
Docket No. 55438.
United States Tax Court
T.C. Memo 1956-202; 1956 Tax Ct. Memo LEXIS 93; 15 T.C.M. (CCH) 1048; T.C.M. (RIA) 56202; 6 Oil & Gas Rep. 546; August 29, 1956
Donald P. Moyers, Esq., and John H. Conway, Jr., Esq., for the petitioners. J. C. Linge, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion The respondent determined a deficiency of $4,869.78 in petitioners' income tax for the year 1951. The sole issue is whether certain oil and gas royalties owned by the petitioners became worthless in the year 1951. A second issue involving a deduction for travel and entertainment has been settled by a stipulation of the two parties. Findings of Fact Arthur Finston and his wife, Renee Finston, have their principal place of business at Tulsa, Oklahoma. They filed a joint Federal income tax return for the year 1951 with the then collector of internal revenue for the district *95 of Oklahoma. Arthur Finston will hereinafter be called the petitioner. Petitioner entered the oil business in 1939 and has remained in that business up to the present time, with the exception of a five year tour of duty with the United States Navy from 1941 to 1946. Petitioner is an independent oil producer and operator with experience in oil fields in Kansas, Illinois, Oklahoma, Texas and New Mexico. As a part of the normal activity of his business he has acquired leases and royalties and has participated in the drilling of wells. Petitioner is aided in his business operations by the services of consulting geologists and information gathered from various sources. In 1947 the Sinclair Oil and Gas Company drilled the Williams well in NW/4 SW/4 of Section 18, Township 5N, Range 2W, McClain County, Oklahoma. This well went to a depth of 7,662 feet and no producing oil or gas formations were found. In 1949 the petitioner learned that Sinclair was preparing to deepen the Williams well and in that year he acquired 118.25 acres of oil and gas royalties in Township 5N, Ranges 2 and 3W, McClain County, in the immediate vicinity of the Williams well, at a total cost of $12,570.25. These *96 purchases were made as follows: Petitioner's
Date
Legal Description
Total
Royalty
Petitioner's
Purchased
McClain County, Oklahoma
Acres
Acres
Cost
1. 9/30/49
W/2 W/2 Section 6-5N-2W, and E/2 E/2 E/2
and W/2 SE/4 SE/4 Section 1-5N-3W
260
16.25
$ 1,228.75
2. 9/23/49
NE/4 NE/4 and N/2 NW/4 NE/4 Section
12-5N-3W
60
10.00
1,289.01
3. 9/12/49
W/2 NW/4 Section 7-5N-2W
80
7.50
969.26
4. 9/ 8/49
SE/4 Section 12-5N-3W, except W/2 NW/4
& 9/23/49
SE/4
140
29.50
2,581.14
5. 10/ 1/49
E/2 NE/4 and N/2 NE/4 SE/4 Section
13-5N-3W
120
12.50
1,598.77
6. 9/29/49
N/2 NW/4 and NW/4 NE/4 and NW/4 SW/4
NE/4 Section 18-5N-2W
130
5.00
522.60
7. 9/ 9/49
SW/4 SE/4 Section 13-5N-3W
40
10.00
777.40
8. 9/23/49
& 9/29/49
NE/4 and NE/4 NW/4 Section 24-5N-3W
200
20.00
2,441.13
9. 9/12/49
NW/4 NW/4 Section 19-5N-2W
40
7.50
1,162.19
Total
1,070
118.25
$12,570.25 In September 1949 the Sinclair Oil and Gas Company renewed drilling operations at the Williams well and went to a depth of 9,458 feet. Production was obtained from the well and such production continued throughout 1950. By February 28, 1951, the production *97 from the Williams well in commercial quantities had ceased and the Sinclair Oil and Gas Company on that date began plugging the well. The plugging was completed in June 1951. The Williams well had been drilled on the higher portion of the sub-surface structure in the area. Geological information available in 1951 indicated that the structure was penetrated by the Williams well and found to be non-commercial. By the end of 1951 the general area in McClain County where the petitioner's royalties were located was surrounded by dry holes. At various times in 1951 the petitioner tried to sell the royalties and was not successful. Before December 31, 1951, the petitioner transferred the royalties to Lionel Cohen, his attorney, without consideration. The Sinclair Oil and Gas Company paid delayed lease rentals either during the year 1951 or the following years on leases held by it in Sections 18 and 19 5N 2W and in Sections 12, 13 and 24 5N 3W. The Sinclair Company acquired a lease on 100 net acres in Section 12, Township 5N, Range 3W on June 29, 1951, and paid a lease bonus in the amount of $2,500. In 1953 the Sinclair Company acquired a new lease and renewed three leases in Section 18 *98 5N 2W and Sections 13 and 24 5N 3W. Some leases which Sinclair owned in this area were not renewed after the abandonment of the Williams well and Sinclair planned no further development in this area after the failure of the Williams well in 1951. During the years 1953 through 1955 the Sunray Oil Corporation acquired approximately 1,590 acres of oil and gas leases in the following sections in McClain County: Section 1, 5N 3W, Section 6, 5N 2W, Section 7, 5N 2W, Section 12, 5N 3W, Section 13, 5N 3W, Section 18, 5N 2W, Section 19, 5N 2W, Section 23, 5N 3W, Section 24, 5N 3W, and Section 30, 5N 3W. The Sunray Oil Corporation paid approximately $60,000 in lease bonuses for the leases acquired in these three years. During the years 1953 and 1954 several companies conducted drilling operations in various sections of McClain County, Oklahoma. The Magnolia Petroleum Company, in 1953, completed drilling a producing oil well in the NE 1/4 of the NE 1/4 of Section 8, 5N 2W, and another one in the SE 1/4 of the SE 1/4 of Section 8, 5N 2W. In 1954 the Magnolia Petroleum Company completed drilling a dry hole in the NW 1/4 of the NE 1/4 of Section 8, 5N 2W. The Skelly Oil Company completed drilling *99 a dry hole in November 1953 in the SW 1/4 of the NW 1/4 of Section 20, 5N 2W. The Sunray Oil Corporation completed drilling a producing well in March 1954, in the SE 1/4 of the SW 1/4 of Section 24, 5N 3W. During the years 1953 and 1954 there were further drilling activities in the general area of Township 5N, Ranges 2 and 3W, and following this activity the Sunray Oil Company acquired leases in the area in 1953 and 1954. On November 1, 1954, Lionel Cohen sold the royalties acquired from the petitioner to the Sunray Oil Company for $100 per acre. Petitioner claimed a loss of $12,570.25 in his income tax return for 1951 on the ground that the royalties had become worthless in that year. Respondent disallowed the loss. Petitioner's oil and gas royalties, acquired by him in 1949 at a total cost of $12,570.25, became worthless in 1951. Opinion MULRONEY, Judge: The only question in this case is whether petitioner is entitled to a deduction in 1951 of $12,570.25 on account of gas and oil royalties he owned in McClain County, Oklahoma, becoming worthless during the year 1951. A loss on account of the worthlessness of an investment may be deducted from gross income. Section 23(e), *100 Internal Revenue Code of 1939, and section 29.23(e)-3 of Regulations 111. The loss provisions of the statute and regulations are applicable to oil and gas royalties. C. C. Harmon, 1 T.C. 40, affd. 139 Fed. (2d) 211, reversed on other grounds 323 U.S. 44. The law is well settled that a loss with respect to property is sustained when the property becomes worthless and the loss may not be postponed. James Petroleum Corporation, 24 T.C. 509. The time of worthlessness must be fixed by an identifiable event. Section 29.23(e)-1, Regulations 111; United States v. White Dental Manufacturing Company of Pennsylvania, 274 U.S. 398. In C. C. Harmon, supra, we said: "An oil and gas royalty interest * * * becomes worthless upon the happening of some event which results in the loss of its sale value in the ordinary channels of trade and would cause a prudent and informed business man to eliminate it from the asset side of his balance sheet. * * *" We quoted the above rule with approval in James Petroleum Corporation, supra.The petitioner had the burden of showing the worthlessness of the royalty interest. *101 The value of a royalty interest in an area depends upon the presence of gas or oil in commercial quantities underlying the area. The subject matter of the royalty interest is the gas and oil in the area and the royalty interest becomes worthless if it be found the subject matter is non-existent. Proof of worthlessness of a royalty interest can be established by evidence that shows the "improbability that oil or gas in profitable quantities will ever be available." C. C. Harmon, supra.The mere possibility of finding oil and gas in the royalty area will not render the royalty interest valuable. In the last cited case we said: "We do not think, however, that this mere 'possibility' of future production is in itself sufficient to give value to oil royalties which have been condemned as worthless by those engaged in the trade and familiar with the development in those particular areas. * * *" From the above it will be seen that petitioner's burden to establish worthlessness is the burden to prove the non-existence of gas and oil in the royalty area or at least its existence was improbable. He had a second burden, namely, the improbability that oil or gas would ever be *102 available in commercial quantities, was demonstrated by some identifiable event occurring in 1951, the year he took his loss. The two issues can be discussed together for petitioner's case is that the event, the final failure of the Williams well and its abandonment in 1951, tested his royalty area and showed with reasonable probability, that it was barren of gas and oil in commercial quantities and therefore worthless. During the year 1947 the Sinclair Prairie Oil Company drilled this well called the Williams well, about the center of the NW 1/4 of the SW 1/4 of Section 18, Township 5 North, Range 2 West in McClain County. This well was drilled to a depth of 7,662 feet and abandoned as a dry hole December 16, 1947. Petitioner states that in 1949 he obtained information that Sinclair planned to deepen this well and he bought royalty interests in an area totaling about 118 acres, located in Section 18, where the Williams well was located and in Sections 7, 13, 19, 12, 24, 6 and 2. Section 18 is bounded on the north by Section 7, on the east by Section 13, and on the south by Section 19. Section 18 corners with section 12 on the northwest, and Section 24 on the southwest. Section 6 *103 lies north of Section 7 and Section 2 lies west of Section 6. From the above it will be seen petitioner's royalty area was partly in Section 18, the section where the Williams well was located, and partly in the sections bordering or cornering Section 18, and partly in two sections adjacent to bordering sections. It is perfectly apparent petitioner, in buying the royalties, was prompted partly at least by his information concerning the proposed deepening of the Williams well. He secured his royalty interest in the same section where the well was located, and in the nearby sections to the north, west, and south. He said he knew this company "was moving in there to deepen an old hole. So that they [the royalties] were bought with the idea that I would get a quick play on the minerals." Sinclair started deepening the Williams well in September of 1949. The well was drilled to a depth of 9,458 feet by December 12, 1949. Oil was found but not in large quantities. It produced in 1950 but at a declining rate and in February 1951 Sinclair plugged and abandoned the well. Plugging of a well seems to consist of pulling out the pipe if that can be done, filling the hole with mud and capping *104 it with cement, and notifying the offsetting leaseholders under the rules of the State Corporation Commission. The cumulative production of the well was 1,628 barrels of oil. It seems to be undisputed that the well failed to attain commercial production. Petitioner entered the oil business in 1939. He is an independent oil producer and operator with experience in oil fields in Kansas, Illinois, Oklahoma, Texas and New Mexico. In his business he has acquired leases and royalties and participated in the drilling of oil wells. He is not a geologist but he is a graduate of the Wharton School of Finance, University of Pennsylvania, and he testified that in his business he uses the services of consulting geologists, and frequently consults with people in the offices of the major oil companies with regard to the possibilities of finding prospective areas in which to drill or buy royalties. He had general knowledge and ability to read geophysical maps and geological reports and interpret what they show as to the likelihood of the presence of gas or oil in an area. Petitioner testified that the purchase of the royalties in question was his first venture into the McClain County area. He *105 bought the royalties in question after examining maps of the area and after learning Sinclair planned to deepen the Williams well. He testified the abandonment and plugging of the Williams well completely destroyed the market for his royalties. He said if he tried to interest any one in the royalties they would check with Sinclair and when they learned the well had been plugged that would "finish it." He testified concerning his efforts to sell the royalties, saying, "I was willing to take what I could get"; that his efforts proved futile, and his ultimate transfer of the royalties without consideration, to a lawyer named Cohen. Cohen testified he later sold the royalty interest for $100 an acre in 1954. Petitioner presented as witnesses two well qualified geologists who were of the opinion the Williams well tested the area of petitioner's royalties, and its failure, together with other data showing other dry holes existing in 1951 to the north, south, and east of the Williams well, condemned the area of the royalties. Condemning an area in the parlance of the oil business seems to be the same as saying there is little or no likelihood of finding oil or gas in commercial quantities *106 underlying the area. There is no use detailing the evidence of these geologists. It is enough to state they interpreted the geological conditions as shown by maps of the area, and other data, and they found the Williams well penetrated the highest structure in the area of the royalty land and its failure condemned the area. One said: "a prognosis for that area to produce would be extremely hazardous." The other said: "I would certainly recommend condemning anything down-dip from the Sinclair well." One geologist testified for respondent. He was asked for his opinion as to whether the Williams well "Did, or did not * * * condemn" the royalty area, and he replied: "I don't believe so." He was the chief geologist for the Sunray-Mid-Continent Oil Company and he said his opinion was based on geophysical work his company had done in this area and he also said this geophysical work had started in 1952. The division land manager of Sinclair also testified for respondent but his testimony was, partly at least, favorable to petitioner. He was not qualified as an expert or a geologist but he was allowed without objection to state his opinion as to whether the abandonment of the Williams well *107 condemned the royalty area. He said it would definitely condemn some of the acreage in Section 18 but he would not say it condemned any of the acreage in the other sections where the royalties were held. He testified that after the well was plugged and abandoned they did not renew all of their leases as they expired. He said Sinclair "had no further development in mind" in this area. On cross-examination he was asked, "Your company's interest * * * had changed considerably after the drilling of this Williams well?," and he replied, "Quite a lot." One other witness who testified for respondent was the president of the Investor's Royalty Company of Tulsa. He was a mining engineer and geologist but he did not testify as such an expert, though he did say the abandoned well would not condemn the value of the royalties in his idea because the well had oil and that was an "indication that there should be more oil in the immediate area." He testified principally concerning the fair market value of the royalties in question. He said the royalties in question would have been "worth" between $25 and $50 an acre, and he said in 1951 he "would have been willing to pay for the entire spread $25 *108 an acre." We feel the preponderance of the evidence favors petitioner. The two geologists who testified for him based their opinions on known data and maps of the established geological formation in the area. They were firm in their opinion that there was little prospect by the close of 1951 that the area would ever produce oil in commercial quantities. They were firm in their judgment that the Williams well had tested the area and its failure condemned it. One of respondent's witnesses agreed it would condemn part of the area lying in Section 18 but he thought it would not condemn the royalty area in other sections - though much of the royalty area in Section 13 would be closer to the Williams well than the royalty area in Section 18. The testimony of respondent's geological expert seemed to be an expression of opinion based on the geophysical work that had been done by his company in the area, the results of which were not in evidence. We feel the record shows that the plugging and abandoning of the Williams well was the event that finally demonstrated the improbability of the existence of oil in commercial quantities in the royalty area. Surely the deepening of this well, and *109 petitioner's foreknowledge of that event, was the identifiable event that, to a large extent, prompted petitioner's purchase of the royalty interests in the area that surrounded the Williams well on three sides. It is understandable that petitioner would conclude the failure of this well would condemn his royalties. We are not disposed to hold his conclusion was unreasonable. He had much experience in the oil business and his opinion was confirmed by the better evidence of the consulting geologists, whose business it is to give opinions as to the probability of gas or oil underlying a certain area. We hold that petitioner sustained his burden of proof to show his royalties were worthless in the year 1951, in the sense that in that year it was rendered improbable that oil or gas in commercial quantities would ever be produced in the royalty area and this fact was demonstrated by the failure of the Williams well and its abandonment in 1951. We do not feel the evidence of his inability to sell his royalties or even the evidence of respondent's one witness who said the royalties were worth $25 to $50 an acre and he would have paid $25 an acre for the royalties in 1951 is determinative. *110 The value of the royalties depended on the existence of gas and oil underlying the area. We have held the royalties worthless as demonstrated by an event that showed the subject matter, the gas and oil in commercial quantities, was probably non-existent. Loss of sale value of the royalties would be a result from the identifiable event - here the abandonment of the Williams well - and the most one can say for evidence of inability to sell the royalties is that other prudent and informed businessmen share the owner's opinion that the royalties are worthless. Some might be found who would pay something for the royalty on the mere "possibility" of future production but that would not give value to the oil royalties "condemned as worthless by those engaged in the trade and familiar with the development in those particular areas." C. C. Harmon, supra.
The evidence of the later sale by Cohen, the assignee, of the royalties for $100 an acre (the amount petitioner paid for them) is not of much value. Such evidence might show the earlier business judgment inaccurate but it does not show the conclusion of worthlessness, reached in 1951, was unsound or unreasonable. Chaparral Oil Co., 43 B.T.A. 457; *111 Rhodes v. Commissioner, 100 Fed. (2d) 966; James Petroleum Corporation, supra.
The evidence is not clear as to whether the formal assignment of the royalties to Cohen was made in 1951 or 1952. Disposal of a valueless royalty interest is not required before a loss can be taken. James Petroleum Corporation, supra.Indeed in the cited case we held the royalty owner could not wait until the year of sale for a nominal consideration in which to take the loss, when a reasonable business judgment would be that the royalties became worthless in a prior year. On the whole record we conclude petitioner's royalty interests became worthless in 1951 in the sense that it was improbable that the royalty area would ever produce oil or gas in commercial quantities and this fact was demonstrated by the failure of the deepening operations in the Williams well, and its being plugged and abandoned in 1951. Petitioner was entitled to the claimed loss deduction. Decision will be entered under Rule 50.