A. L. Stanchfield [1] v. Commissioner. Stanchfield v. Commissioner
Docket No. 554-63.
United States Tax Court
T.C. Memo 1965-305; 1965 Tax Ct. Memo LEXIS 24; 24 T.C.M. (CCH) 1681; T.C.M. (RIA) 65305; 23 Oil & Gas Rep. 1038; November 26, 1965
William R. Busch, Degree of Honor Bldg., St. Paul, Minn., for the petitioner. Benjamin E. Butts, for the respondent. KERN
Memorandum Findings of Fact and Opinion Respondent determined deficiencies in petitioner's income tax for the years and in the amounts as follows: Year
Deficiency
1956
$ 5,091.04
1957
3,834.15
1958
7,006.25
1959
32,321.69
The principal question for our decision is whether petitioner is entitled to a business loss *26 deduction of $124,995.40 for the year 1959. Petitioner contends that such loss is properly deductible under sections 162 and 165 of the Internal Revenue Code of 1954, but argues in the alternative that it is deductible as a business bad debt under section 166 of the 1954 Code. Respondent originally determined that petitioner's claimed deduction of $124,995.40 constituted a nonbusiness bad debt allowable only to the extent provided by section 166(d)(1)(B) of the 1954 Code. In his amended answer respondent alleged that the proper amount of such nonbusiness bad debt was not in excess of $111,995.40. In an amended petition petitioner raised two additional issues: (1) Whether petitioner is entitled under the provisions of section 165, 1954 Code, to a loss deduction for 1959 in the amount of $4,060.69 in connection with an alleged abandonment of an oil lease interest in Guadalupe County, Texas, rather than a capital loss deduction in this amount as originally claimed by petitioner; and (2) as an alternative to his primary contention with regard to the deduction of $124,995.40 whether petitioner is entitled to a deduction of $14,175 thereof in 1959 due to an alleged *27 theft loss. The deficiencies determined by respondent for the years 1956, 1957, and 1958 rest upon disallowances of net loss carrybacks from the year 1959. Our resolution of the above issues for the year 1959 will result in resolution of the deficiencies for all the years before us by means of computations under Rule 50. Findings of Fact Some of the facts have been stipulated and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein and made a part of our Findings by reference. Petitioner, A. L. Stanchfield, hereinafter sometimes referred to as Stanchfield or petitioner, is an individual who lived during the years in question at Excelsior, Minnesota. He filed his Federal income tax returns for the taxable years 1956, 1957, 1958, and 1959 with the district director of internal revenue for the district of Minnesota. Petitioner computed his Federal income tax during the years before us on the cash receipts and disbursements method of accounting. For most of his life petitioner has worked in the grain distribution business. About 1920 he began his own enterprise as a jobber of feed ingredients. During the years in issue petitioner was president *28 and treasurer of A. L. Stanchfield, Incorporated, and owned about 90 percent of its stock. This corporation was incorporated under the laws of the State of Minnesota on June 27, 1946, as the successor to the sole proprietorship under which petitioner had conducted his business since 1920. During the years before us petitioner was also the president, treasurer, and controlling shareholder of The Stanchfield Corporation, which was incorporated under the laws of the State of Minnesota on October 13, 1949, as the successor to a real estate rental business previously carried on as a partnership between the petitioner and his wife, E. R. Stanchfield. The petitioner was also an executive and financially interested in International Sugar Feed Company, a feed additive manufacturer, and National Vitamin Products Company, a feed manufacturer. Petitioner was also financially interested in a company known as International Machinery Development Company. During the course of his business career petitioner participated in several business enterprises with members of his family. These included a real estate partnership with his wife which was succeeded in 1949 by The Stanchfield Corporation; a *29 partnership with his wife, his son, Roald Stanchfield, and the latter's wife, which operated the International Sugar Feed Company beginning in 1943; several oil exploration joint ventures in Texas in 1952 and 1953 with several individuals including Weed L. Peterson (who was married to petitioner's daughter Mylla prior to and during 1958 and 1959); an oil lease joint venture with Weed L. Peterson and others in Guadalupe County, Texas, during the years before us; and a subventure in 1958 with Weed L. Peterson for the purpose of exploring and developing minerals in a tract near the city of Condoto, in the Republic of Colombia. In 1958 and 1959 Weed L. Peterson, sometimes hereinafter referred to as Peterson, was the president of Peterson Construction Company, Inc., hereinafter sometimes referred to as Construction, a pile-driving contracting firm located in Houston, Texas. During the early part of September 1958 Peterson approached petitioner about affording financial assistance in the performance of two construction contracts which had been awarded it by Gulf States Utilities Company, hereinafter sometimes referred to as Gulf States. These contracts called for the construction of tower *30 foundations and cable anchors for a transmission line across the Mississippi River at Red Eye, Louisiana, and construction of condensing water intake and discharge structures at the Willow Glen Power Station in St. Gabriel, Louisiana. The price to be paid for performing the Red Eye contract was $114,860 and the total contract price for the work at Willow Glen was $909,484. Petitioner was not a party to either of these contracts. Peterson Construction Company, Inc., signed these contracts sometime during November 1958. On September 11, 1958, Peterson wrote to the petitioner and asked for "help on this job." He proposed that the petitioner act as cosigner on a million-dollar bond and supply cash in the amount of approximately $36,000. Peterson suggested that in exchange for the petitioner's assistance with regard to the bond and the financing that "[they] split the profit, fifty-fifty." At that time Peterson estimated that the net profits from the two contracts would be $100,000. He later thought they might be as high as $200,000. Upon receipt of this letter petitioner interpreted Peterson's proposal as one which contemplated a complete partnership between the two parties on the contracts. *31 Petitioner was unwilling to participate on this basis because he "figured it involved too much." Consequently, he did not accept the letter proposal. Subsequent to September 11 petitioner and Peterson had several telephone conversations with respect to the role petitioner would play in the execution of the two contracts which were awarded Peterson Construction Company, Inc. At this time they contemplated that petitioner would assist Peterson Construction Company, Inc., through advances in amounts sufficient to enable the company to meet its payrolls, personal guarantees on some of its supply contracts, and extending his credit in obtaining performance bonds. Petitioner never intended to make any gifts to Peterson Construction Company, Inc. It was understood between petitioner and Peterson that petitioner would be entitled to 50 percent of the net profits to be derived from the contracts. No agreement was reached between the parties concerning the sharing of losses because neither petitioner nor Peterson anticipated any losses. The discussions between petitioner and Peterson were informal and were not reduced to writing. It was contemplated that Peterson would ask the petitioner for *32 financial assistance as each occasion arose. However, petitioner believed during September and October 1958 that Peterson Construction Company, Inc., would not require advances from him in amounts more than $36,000 in connection with the two projects. There was no definite agreement between them as to the maximum amount to be advanced by petitioner. The Stone & Webster Engineering Corporation was the agent for the Gulf States Utilities Company in connection with the Red Eye and Willow Glen contracts. On February 14, 1959, a performance and payment bond was signed by Peterson Construction Company, Inc., as principal and A. L. Stanchfield as surety, guaranteeing the performance by Construction of the contract for the Willow Glen project. The bond ran to the benefit of "GULF STATES UTILITIES COMPANY, Stone & Webster Engineering Corporation, AGENT * * *." Second and third performance and payment bonds covering the same contract were signed on March 12, 1959, and April 14, 1959, respectively. All three performance and payment bonds were identical except for the fact that the second and third bonds were notarized. Petitioner signed these bonds after considerable but unsuccessful efforts *33 to secure a performance bond from an insurance company. In December of 1958 and January of 1959 petitioner attempted to arrange with a Houston, Texas, bank for a $50,000 loan to Peterson Construction Company, Inc., for payroll purposes. He offered to provide the bank with a personal guarantee of repayment, but the bank refused to make the loan. During the period October 21, 1958, through July 28, 1959, petitioner, as an individual, advanced a total of $71,000 to Peterson Construction Company, Inc., in connection with the two contracts for Gulf States. In exchange for the $71,000 advanced, petitioner received ten promissory notes, each bearing interest at the rate of 6 percent per annum. The makers, amounts, and terms of these notes were as follows: Date
Payee
Maker
Due
Amount
10-21-58
A. L. Stanchfield
Weed L. Peterson
Demand
$ 1,000.00
1-20-59
A. L. Stanchfield
Weed L. Peterson
Demand
4,000.00
1-29-59
A. L. Stanchfield
Weed L. Peterson
Demand
5,000.00
2- 3-59
A. L. Stanchfield
Weed L. Peterson
Demand
5,000.00
2- 9-59
A. L. Stanchfield
Weed L. Peterson
Demand
5,000.00
3- 6-59
A. L. Stanchfield
Peterson Construction Company, Inc.
Demand
35,000.00
5- 6-59
A. L. Stanchfield
Peterson Construction Company, Inc.
60 Days
5,000.00
6-25-59
A. L. Stanchfield
Peterson Construction Company, Inc.
Demand
3,000.00
6-26-59
A. L. Stanchfield
Peterson Construction Company, Inc.
Demand
3,000.00
7-28-59
A. L. Stanchfield
Peterson Construction Company, Inc.
Demand
5,000.00
*34 As of the time of trial none of these notes had been paid. The fact that five of these notes were signed by Peterson individually and five were signed by Construction was not regarded as significant by Peterson who viewed them all as "advances into the job." During the period April 15 to May 28, 1959, A. L. Stanchfield, Incorporated, advanced the total amount of $25,000 to Peterson Construction Company, Inc. These advances were made in connection with the Willow Glen contract. In exchange for the $25,000 A. L. Stanchfield, Incorporated, received two promissory notes in the amounts of $1,500 and $3,500 (the former from Weed L. Peterson and the latter from Peterson Construction Company, Inc.), each bearing interest at the rate of 6 percent per annum and payable on demand. As of the time of trial these two notes had not been paid. The remaining $20,000 of the advance was covered by a check in that amount from Peterson Construction Company, Inc., made payable to A. L. Stanchfield. The check was dated February 21, 1959, and at the time of trial had not been presented for payment. The books of A. L. Stanchfield, Incorporated, recorded the $25,000 transmission of funds as a debt of *35 petitioner to A. L. Stanchfield, Incorporated, and the latter carried it as a loan receivable. This $25,000 debited to the "Loans Receivable - A. L. Stanchfield" account was paid by the petitioner on September 30, 1959. On September 25 and October 29, 1958, one Palma Rekdahl advanced Peterson $10,000 and $5,000, respectively, to provide him with additional funds in his performance of the two contracts for Gulf States. Palma Rekdahl married the petitioner on April 21, 1959. In exchange for the $15,000 Peterson gave Palma Rekdahl two promissory notes signed by him individually and payable on demand in the above-mentioned amounts. Petitioner requested on June 15, 1959, that Peterson set up a schedule of repayment of the advances made to Construction by petitioner and Palma Rekdahl. No such schedule was set up and no such repayments were made by Construction or Peterson. The petitioner guaranteed the repayment of the $15,000 advanced by Palma Rekdahl and reimbursed her prior to December 31, 1959, pursuant to that guarantee. As of the time of trial Peterson had not paid the petitioner this $15,000. In addition to the previously discussed advances made to Peterson, The Stanchfield Corporation *36 loaned a total of $13,000 to Peterson Construction Company, Inc., in connection with the two Gulf States contracts. The $13,000 was advanced as follows: $5,000 was transmitted by check dated October 18, 1958, and $3,000 was transmitted by check dated November 4, 1958, these two checks being made payable to "Peterson Construction Co." The remaining $5,000 was advanced by means of a check dated November 20, 1958, in that amount, made payable to Palma Rekdahl, who in turn transmitted the proceeds to the Peterson Construction Company, Inc. The $8,000 which was advanced directly to the Peterson Construction Company, Inc., by The Stanchfield Corporation was recorded on the notes receivable ledger of The Stanchfield Corporation as debits to "Peterson Const. Co." by entries dated October 22 and November 4, 1958, in the respective amounts of $5,000 and $3,000. The $5,000 advanced to Peterson Construction Company, Inc., through Palma Rekdahl was recorded as a debit to "Palma Rekdahl" on the notes receivable ledger of The Stanchfield Corporation by entry dated November 20, 1958, although, as hereinafter found, the note evidencing this advance was executed by Peterson to the order of The Stanchfield *37 Corporation. In connection with the $13,000 thus advanced to Peterson Construction Company, Inc., Weed L. Peterson individually signed three promissory notes payable on demand to The Stanchfield Corporation in the amounts of $5,000, $3,000, and $5,000 dated respectively October 18, November 4, and November 10, 1958. As of the time of trial, The Stanchfield Corporation had not been repaid the $13,000 it thus advanced to Peterson Construction Company, Inc. On July 1, 1959, a checking account was opened at The National Bank of Commerce, Houston, Texas, in the name of Peterson Construction Company, Inc., Special Account. This account was established at the suggestion of R. L. Keeton, the general superintendent for Stone & Webster, the agent for Gulf States Utilities Company. Keeton felt that an account which required the petitioner's as well as Peterson's signature would serve to coordinate decisions on which bills to pay with the available funds, and to eliminate complaints of creditors. The creditors involved in the Willow Glen contract were complaining that they were not being paid, and Keeton suspected that Peterson was using part of the progress payments from this contract to *38 pay creditors from previous jobs. Moreover, Keeton proposed that he and the petitioner meet once a month in order to decide on bill payments and thus minimize creditor complaints. The signature of the petitioner and the signature of either Weed L. Peterson or Mylla S. Peterson were required on all checks drawn on this account. Prior to the opening of the special account, the proceeds of the loans made by petitioner and others to Peterson Construction Company, Inc., and the progress payments on the two contracts were deposited in its bank account which was used for its general business, and all funds of Peterson Construction Company, Inc., were disbursed solely by Weed L. Peterson. Petitioner's signature was not required on checks drawn on any other Peterson Construction account except the special account. As a result of the opening of the special account, the petitioner maintained a ledger covering the deposits and disbursements out of this account commencing June 30, 1959. The only funds deposited in the special account were progress payments from Stone & Webster. At no time did petitioner receive from Peterson an accounting in advance of how money would be spent. In August of *39 1959 Peterson signed the petitioner's name to three checks drawn on the special account. The amounts of these checks totaled $14,175. He did this because the petitioner was unavailable at the time and Peterson had to make a deposit to the Peterson Construction Company, Inc., payroll account for the employees at work on the Willow Glen contract. Peterson assumed that he "could make it all right with him [the petitioner] when [he] saw him." The petitioner never authorized the drawing of these three checks which constituted the total amount of $14,175. Petitioner never instituted any civil or criminal action against Weed L. Peterson for signing petitioner's name to these three checks drawn on the special account. Petitioner arranged for the guarantee of the following material and supply accounts for Construction: The L. B. Foster Company and Foster International Corporation (an affiliate) and the Orleans Materials & Equipment Co., Inc. Petitioner began to guarantee the account of L. B. Foster Company in the name of A. L. Stanchfield, Inc. On October 22, 1958, the L. B. Foster Company in Houston returned two sales acknowledgments and informed petitioner that the home office required *40 that he sign them in his individual capacity. One more sales acknowledgment which petitioner signed on behalf of A. L. Stanchfield, Inc., before receipt of the October 22 letter, was returned to him for the purpose of obtaining his individual signature. Both Foster concerns were major material suppliers of Peterson Construction Company, Inc., in its performance of the two contracts. Petitioner also guaranteed payment by Peterson Construction Company, Inc., of an invoice in the amount of $6,575 from the Orleans Materials & Equipment Co., Inc. This guarantee was made in the name of "A. L. Stanchfield, Inc., Joint Venturer." Petitioner visited the construction sites at Red Eye and Willow Glen in November and December of 1958, and January of 1959. After the Red Eye contract was completed in March 1959 petitioner visited the Willow Glen project in July, August, and September of 1959. The trips in late 1958 and early 1959 were made primarily for the purpose of obtaining a performance bond and a bank loan for Peterson Construction Company, Inc. Petitioner's visits to the Willow Glen job site in July, August, and September of 1959 were made at the request of R. L. Keeton, the Stone & Webster *41 construction engineer who had been in charge of both projects and was now working at Willow Glen. Keeton suggested that these monthly meetings take place so that he and petitioner could agree on which bills to pay. During the period January through March 1959 petitioner and Peterson conferred about the progress of the job by means of telephone conversations on the average of once or twice a week. During the period March through August 1959 the record indicates that petitioner received from Peterson one progress chart of the jobs, one set of photographs, and several cost statements and receipt and disbursement schedules. In a letter dated April 20, 1959, to petitioner from R. L. Schlosser (the office manager of Peterson Construction Company, Inc.), Schlosser stated that "[it] is out intention to furnish you with a weekly payroll summary * * *." After the establishment of the special account petitioner kept his own records of receipts and disbursements of the Willow Glen contract. Moreover, petitioner made several technical suggestions to Peterson and Keeton concerning the progress of the Willow Glen contract and the payments to outstanding creditors during the period June to August *42 1959. He also engaged in correspondence and telephone communication with the creditors of Peterson Construction Company, Inc. On May 6, 1959, Peterson wrote to Stone & Webster concerning additional claims for additions to the scope of the work on the Willow Glen contract. These claims amounted to $94,133.21 for additional material and labor, and Peterson requested that "our contract price be increased accordingly." As of June 3, 1959, Construction was having difficulty paying its creditors and meeting its payroll with respect to the Willow Glen contract. In a letter dated August 7, 1959, Stanchfield asked R. L. Keeton to make an adjustment on the contract price because of the claims for extra work made by Peterson. This letter was sent approximately 4 days after a personal meeting petitioner had with Peterson and Keeton concerning the claims for additions to the Willow Glen contract price. On September 12, 1959, Keeton wired the petitioner that Stone & Webster intended to take over the Willow Glen job for Gulf States within 2 days by reason of the default of Peterson Construction Company, Inc. He further stated that "we except to hold you [the petitioner] liable as surety *43 on said contract for all costs, expenses and damages incurred in completing the job." Petitioner responded by telegram on the same day urging Keeton to allow Construction to finish the job by the original deadline date, December 1. Petitioner indicated in this telegram that Construction felt any failure on its part was due to Stone & Webster's insistence that bills be paid in full thereby creating payroll shortages. As of September 12, 1959, there were unpaid creditors in connection with the Willow Glen contract whose claims were in the total amount of $185,340.38. In October 1959 the petitioner went to the New York office of Stone & Webster to confer with its officials about the remaining costs of completion of the Willow Glen contract and the claims for the extra work. With regard to the latter, Stone & Webster indicated that nothing could be done by it since the entire matter was in the hands of its attorneys. Stone & Webster did complete the Willow Glen job for Gulf States Utilities Company. On March 18, 1960, the attorneys for Gulf States informed Peterson Construction Company, Inc., that the total indebtedness on the job was $380,325.03. This figure represented costs of completion *44 and claims of creditors. On November 23, 1959, the district director of internal revenue at Austin, Texas, seized and sold all the assets of Peterson Construction Company, Inc. At that time the Internal Revenue Service also seized and sold all the assets of Weed L. Peterson which were not then pledged. At the end of 1959 Peterson and Peterson Construction Company, Inc., had no assets which would have been available for the claims of creditors. Late in 1960 or early in 1961 Gulf States Utilities Company commenced a civil action in the United States District Court, District of Minnesota, Fourth Division, against the petitioner in his capacity as surety on the Willow Glen contract of September 8, 1958. In a deposition of petitioner taken in connection with this civil action on December 15, 1961, petitioner testified as follows: Q. Did you ever have any conversations with him [Peterson] about acting as a joint-venturer? A. He proposed it in this letter that he was willing to give me half of what he made, but I never answered him on that or accepted or ever thought of accepting him. Q. This was in the September letter? A. Yes. I am too busy. I wouldn't want to be in on a deal *45 like that because I'm really too busy with my other businesses. Q. But he proposed your going in on the job with him in the September letter and you didn't answer that and you had no further conversations ever with Weed about it; is that correct? A. That's right. * * *
Q. Mr. Stanchfield, after the arrangements were made for this special bank account I take it you followed the job progress fairly closely from that point forward? A. No, I don't think I did. Q. Oh, you didn't? A. Not any more than before; I was up here. I just went down and spent a day there, down on the train and spent a day there and came back. * * *
On December 8, 1962, and January 10, 1963, petitioner paid a total of $60,000 to Gulf States Utilities Company in full settlement of the latter's claim against him in the above-mentioned civil action. Petitioner also reimbursed A. L. Stanchfield, Incorporated, in the amount of $3,200 that it had paid to L. B. Foster Company on behalf of Construction. This payment and the $60,000 settlement to Gulf States were the only funds petitioner individually paid to creditors of either the Red Eye or Willow Glen contracts. Petitioner paid the following amounts *46 for legal and accounting services in connection with the contracts Peterson had with Stone & Webster during the year 1959: Recipient
Date
Amount
George E. Weaver, C.P.A.
Oct. 31, 1959
$735.00
George E. Weaver, C.P.A.
Oct. 5, 1959
165.00
Oscar A. Brecke, Atty.
June 9, 1959
45.40
Ted Bailey, Atty.
Oct. 31, 1959
50.00
$995.40
Petitioner did not have any of his own employees at work on the Red Eye or Willow Glen contracts. He has never been in the contracting business, has had no engineering experience, and was not during the years in question an officer or shareholder of Peterson Construction Company, Inc. There were no joint venture or partnership Federal income tax returns filed by the petitioner with respect to either of the contracts. Moreover, petitioner and Peterson Construction Company, Inc., did not jointly file employees' quarterly withholding tax returns for any of the taxable periods ended December 31, 1958, March 31, 1959, June 30, 1959, and September 30, 1959. Petitioner also derived income during the years before us from interests in certain oil properties. His income tax returns for 1956 through 1959 indicate that the amounts *47 of this income diminished over these 4 years as follows: Gross Oil
Net Oil
Year
Income
[1] Income 1956
$868.31
$200.59
1957
215.38
(111.68)
1958
90.81
(96.56)
1959
17.89
(26.84)
Petitioner acquired in 1955 a 10 percent interest in an oil lease in Guadalupe County, Texas. Petitioner and his partners in this venture ceased to make any payments on the oil lease after November 1959. On November 28, 1959, petitioner received a check in the amount of $339.31, which represented his share of the salvage from the shutting down of the well and the sale of the lease equipment, plus his proportionate share of the operating reserve credit of the venture. As of December 31, 1959, petitioner's total adjusted basis in this interest was $4,060.69. In his return for 1959 petitioner reported a capital loss of $4,060.69. Respondent's notice of deficiency contained the following schedule for the year ended December 31, 1959: Schedule 12
Computation of Capital Loss Carry-Over to 1960
Capital loss per return
($ 4,060.69)
Nonbusiness bad debt, Schedule 9,
item (a)
( 124,995.40)
Total
($129,056.09)
Amount of loss used in 1959
( 1,000.00)
Capital loss carry-over to 1960
($128,056.09)
*48 Opinion KERN, Judge: The principal question presented for our decision concerns the proper tax treatment of certain "advances" in the amount of $124,995.40 petitioner and The Stanchfield Corporation made to Weed L. Peterson and Peterson Construction Company, Inc., during 1958 and 1959. Two other issues raised by amended petition involve: (1) Whether petitioner, as an alternative to the principal issue, is entitled to a deduction for a theft loss for 1959 in the amount of $14,175 under section 165(c)(3) of the 1954 Code; and (2) whether petitioner is entitled to an abandonment loss for 1959 with regard to his oil lease interest in Guadalupe County, Texas, in the amount of $4,060.69. Petitioner contends, with respect to the principal issue, that he was engaged in a "subventure" with his son-in-law Weed L. Peterson, and that his 1959 loss was properly deductible either as a business expense or as a business loss under section 162 or 165, respectively. If we find that petitioner and Peterson were not engaged in a "subventure" or any other kind of business enterprise, petitioner argues that his loss is properly deductible as a business bad debt under section 166. Respondent urges *49 that petitioner and Peterson were not involved in any joint enterprise. Rather, he maintains that petitioner's loss was due to loans made to Peterson and Peterson Construction Company, Inc., which were never repaid. Respondent's position is that the worthlessness of these debts gives rise to a nonbusiness bad debt deduction pursuant to the provisions of section 166(d). There is also a dispute between the parties concerning the exact amount petitioner advanced to Peterson and Construction. Respondent contends in an amended answer that the amount of petitioner's loss for the year 1959 did not exceed $111,995.40. Since this addition to the pleadings is inconsistent with his original statutory determination, respondent has the burden of proof on this issue. Rule 32, Tax Court Rules of Practice. Petitioner, on the other hand, argues that the correct amount of this loss was $124,995.40. The difference of $13,000 is due to the fact that respondent does not regard the advance in that amount from The Stanchfield Corporation to Construction as part of the fund which petitioner advanced to Peterson and Construction. Petitioner contends that the $13,000 item is properly includable in the total *50 advances made by him to Peterson and Construction. He asserts that The Stanchfield Corporation regarded this sum as having been advanced to Peterson on his [the petitioner's] behalf, and therefore part of his loss for 1959. The record indicates that The Stanchfield Corporation recorded the transaction of loaning Construction the $13,000 as follows: $5,000 and $3,000 were debited on the notes receivable ledger to the account of "Peterson Const Co." on October 22 and November 4, 1958; $5,000 was debited on the same ledger to the account of "Palma Rekdahl" on November 20, 1958. Palma Rekdahl transmitted this latter amount to Construction. Nowhere on the notes receivable ledger page, a photostatic copy of which was admitted in evidence, is there any indication that The Stanchfield Corporation made these advances for the account of the petitioner. Nor is there any evidence of any payments on a guarantee of the repayment of these loans by the petitioner to The Stanchfield Corporation. Apparently the only basis upon which the petitioner urges us to include the $13,000 in a consideration of his loss for 1959 is his oral testimony that these advances were for his own account. This we are *51 unwilling to do. The accounting records of The Stanchfield Corporation support the contentions of respondent. Unlike the advances of A. L. Stanchfield, Incorporated, which were recorded on its books as loans to petitioner and which were repaid to it by petitioner, the advances of The Stanchfield Corporation were not shown on its books as receivables from petitioner and were not shown as having been repaid by him or anyone else. The Stanchfield Corporation was in existence from 1949 and conducted a real estate business. The fact that petitioner was the president and controlling stockholder of The Stanchfield Corporation does not entitle him to disregard the corporate entity to claim for himself losses which the corporation sustained. It is well settled that a corporate entity will not be disregarded for tax purposes merely because the sole or controlling stockholder retains detailed control of the affairs of the corporation. National Carbide Corp. v. Commissioner, 336 U.S. 422; Skarda v. Commissioner, 250 F. 2d 429, affirming 27 T.C. 137; Chelsea Products, Inc., 16 T.C. 840, 851, affd. 197 F. 2d 620. We therefore find *52 that petitioner's losses for the year 1959 did not exceed $111,995.40. With respect to the issue involving the deductibility of these unrepaid advances, petitioner first argues that the funds which he put at the disposal of Peterson and Construction, for the purpose of assisting the latter's performance of the Red Eye and Willow Glen contracts, constitute either business expenses deductible under section 162(a)[2] or business losses under section 165. [3] In order to come within the purview of section 162(a) or section 165(a) and (c), petitioner must demonstrate that his expense or loss was incurred in the conduct of a "trade or business" or in a "transaction entered into for profit." Petitioner contends that his relationship with Peterson constituted a "subventure," that the funds which he advanced were placed at the risk of the business and that he entered into an oral agreement with Peterson that they would share the profits from the two jobs equally. *53 We find petitioner's characterization of the enterprise as a "subventure" to be inaccurate because a subventure is an agreement between a member of a joint venture and a nonmember to share a part of the member's profits in a stated manner. Stated more accurately, petitioner's contention is that he and Peterson were engaged in a joint venture or partnership which had as its purpose the performance of the two contracts, which had previously been awarded to Construction. In order to determine whether or not a joint venture or partnership existed between the petitioner and Peterson, we must examine the facts as we have found them in the light of certain criteria, none of which is independently conclusive, which have been developed by the courts. While all of these factors are to be considered, the fundamental question of fact to the answer of which they are designed to constitute guides is whether the parties intended to, and did in fact join together for the accomplishment of a specific enterprise. Commissioner v. Culbertson, 337 U.S. 733. As we stated in Hubert M. Luna, 42 T.C. 1067, at pages 1077 and 1078, some of these factors are: The agreement of *54 the parties and their conduct in executing its terms; the contributions, if any, which each party has made to the venture; the parties' control over income and capital and the right of each to make withdrawals; whether each party was a principal and corpoprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; whether business was conducted in the joint names of the parties; whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; whether separate books of account were maintained for the venture; and whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise. Under the facts of record we have concluded that petitioner made these advances with the expectation and intention of making a profit from the enterprises thus financed, i.e., by sharing in the proceeds of the two contracts. We do not believe that petitioner, a canny businessman with *55 a substantial amount of commercial experience, would have advanced or caused to be advanced $111,000 and extended himself as a surety and guarantor merely for the purpose of charging interest on the advances alone. In making this determination, we are aware of the fact that the relationship between petitioner and Peterson was that of father-in-law and son-in-law during the years before us. However petitioner may have reacted initially to the profit-sharing offer made by Peterson because he "figured it involved too much" and however he may have characterized his business relationship with Peterson in the deposition taken in 1961, the fact remains that petitioner did become deeply interested and involved in the success of Construction in performing these two contracts. In attempting to classify the transaction for tax purposes, we face the initial difficulty arising out of the indefiniteness and informality of the agreement between petitioner and Peterson. This problem is compounded by the inconsistency between petitioner's initial stated unwillingness to become deeply involved in the enterprise and the actions taken by him subsequent to these statements. Moreover, the failure of Construction *56 to complete the Willow Glen contract and its inability to repay the advances to petitioner which precipitated the controversy here involved were not anticipated by either party at the time the work began on the two contracts. As we view the record herein, the basic circumstances of the transaction were as follows: Upon the award of the two contracts to Construction, Peterson wrote to petitioner and asked him to lend his financial assistance to the projects in return for one-half of the profits. Petitioner refused this offer because he did not want to become involved as a full partner. After subsequent explanations by Peterson concerning the nature of the job and the opportunity for obtaining large profits, petitioner did agree to assist Peterson and Construction by making advances, personal guarantees on some supply contracts, and extending his credit in order to obtain a performance bond. In exchange for this assistance, petitioner would be entitled to 50 percent of the net profits from the contracts. After a considerable but unsuccessful campaign to obtain a performance bond from an insurance company, petitioner himself signed three performance and payment bonds as surety guaranteeing *57 the performance of the principal, Construction, on the two contracts. During the period October 1958 through July 1959, petitioner, as an individual, advanced a total of $71,000 to the enterprise. As evidence of the receipt of the $71,000 advanced, Peterson executed or caused to be executed ten promissory notes, each bearing interest at the rate of 6 percent per annum. The terms, amounts, and the makers of these notes are set out in detail in our Findings, supra. In April and May 1959 petitioner caused his controlled corporation, A. L. Stanchfield, Incorporated, to advance a total of $25,000 to the enterprise in connection with the Willow Glen contract. As evidence of the receipt of this sum, petitioner received a check in the amount of $20,000 from Construction dated February 21, 1959, which was never presented for payment and A. L. Stanchfield, Incorporated, received two notes (one for $1,500 and the other for $3,500) bearing interest at the rate of 6 percent per annum. The terms, amounts, and makers of these notes are set out in our Findings, supra. The $25,000 transmitted to Construction by A. L. Stanchfield, Incorporated, was recorded on the books of the latter as a debt of *58 the petitioner to A. L. Stanchfield, Incorporated. Petitioner personally paid A. L. Stanchfield, Incorporated, the $25,000 it advanced on September 30, 1959. In September and October 1958 Palma Rekdahl, who was to marry petitioner in April 1959, advanced Peterson a total of $15,000 in connection with the two contracts. Peterson gave Palma Rekdahl two promissory notes signed by him individually in the respective amounts of $10,000 and $5,000 payable on demand. The petitioner guaranteed the repayment of the advances made by Palma Rekdahl and reimbursed her prior to December 31, 1959. Petitioner also arranged for the guarantee of three supply accounts for Construction: L. B. Foster Company, Foster International Corporation, and the Orleans Materials & Equipment Co., Inc. The only payment made on these material guarantees was the amount of $3,200 paid to L. B. Foster Company by A. L. Stanchfield, Incorporated. The latter was reimbursed by petitioner. We have set out in detail in our Findings, supra, the extent of petitioner's activities with respect to the two contracts obtained by Construction. These included visits to the construction sites, trips to obtain a performance bond, *59 consultation by telephone and by mail with Peterson, meetings with Peterson and the construction superintendent with respect to the financial and physical progress of the jobs, and participation as a cosigner in the disbursements made from the special account. During the period June 1959 through October 1959 petitioner expended the amount of $995.40 to two attorneys and an accountant for investigative and other work with respect to the two contracts signed by Construction. Respondent argues that the losses incident to these unrepaid advances were nonbusiness bad debts, and that petitioner's sole relief is governed by section 166(d). Respondent's argument emphasizes the fact that each advance made was recorded on a note, most of which were interest-bearing, [4] and that petitioner expected repayment of the advances. Moreover, he argues that there was no agreement between petitioner and Peterson to share the profits of the two contracts. As evidence of this last contention, respondent calls our attention to the first rejection of a partnership by petitioner, his testimony on the deposition, the failure of petitioner to sign the two contracts with Gulf States as a principal, the failure *60 of the petitioner and Peterson to file Federal partnership returns, the lack of any representations of a significant nature to third parties that petitioner was a joint venturer, and the lack of activity by petitioner with respect to the two jobs which would be commensurate with that of a coproprietor in such a situation. The giving of notes is not in itself conclusive of a bona fide debt. Republic Steel Corporation v. United States, 141 Ct. Cl. 499; 159 F. Supp. 366; Hattie Wolff, 26 B.T.A. 622. Petitioner's first expression of expectation of repayment was made in a letter to Peterson dated June 15, 1959, which urged him to "[set] up a paying off schedule for his and his wife's advances. The fact that this letter was written 8 months after the first advance was made by petitioner is some indication that petitioner's advances bore a substantial risk of the enterprise and that he regarded them as tied up until the venture began to show a profit. Moreover, the manner in which the venture was conducted, *61 with regard to the priority of every other account over any proposed repayment of petitioner's advances is some indication that these advances constituted contributions to the capital of the venture rather than bona fide debts. Farley Realty Corporation v. Commissioner, 279 F. 2d 701, affirming a Memorandum Opinion of this Court. As we have stated earlier, we believe that petitioner and Peterson did agree that the profits from the two contracts would be shared by them equally. The fact that petitioner in his deposition taken in connection with the suit against him as surety negated an intention of becoming a partner with Peterson and testified before us that he rejected an offer to become such a partner is not determinative of the question of whether a joint venture did in fact exist. Estate of L. O. Koen, 14 T.C. 1406, 1409. The fact that petitioner stood in the background and neither signed the contracts nor held himself out to third parties as a joint venturer is not determinative of the question. Beck Chemical Equipment Corporation, 27 T.C. 840, 851. Nor does the fact that the active participation on the part of petitioner was less than *62 that of Peterson vitiate the existence of a joint venture. Beck Chemical Equipment Corporation, supra at 852. Moreover, the filing of Federal partnership returns and the keeping of separate books are but single factors which are not indispensable to the formation of a joint venture. Lucia Chase Ewing, 20 T.C. 216, 232. Cf. Lawrence Y. S. Au, 40 T.C. 264, 267. In our opinion more persuasive factors in the case before us are that the petitioner contributed necessary money and credit in large amount to a business enterprise under circumstances which would not have attracted an outside lender for the purpose of sharing equally with another in the profits of such enterprise and also contributed managerial services thereto. As we have stated, the essential question is whether "the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." Commissioner v. Culbertson, supra at 742. The various criteria we have set forth constitute objective instruments which a trier of fact can use in an attempt to ascertain the subjective intent of the parties. Upon examination of the *63 record in the light of all the relevant criteria, we conclude that petitioner and Peterson intended to, and did in fact join together for the purpose of conducting a business enterprise, i.e., the performance of the two contracts for Gulf States Utilities Company. Once having decided that petitioner and Peterson were joined in a common business venture, we must still determine the character of the advances. We are aware that we have held that a partner can loan money to a partnership in which he is a member. See Montell Davis, 11 T.C. 538; George A. Butler, 36 T.C. 1097. However, we believe that the same criteria which obtain for debtequity cases involving shareholders and their corporations are relevant in answering the question of whether the advances petitioner made to the joint venture were loans or capital contributions. Joseph W. Hambuechen, 43 T.C. 90, 100, 101. These criteria include the type of instrument evidencing the advance; the presence or absence of a maturity date; the source of the payment and the right to enforce payment; the participation of the party making the advances in management; whether the repayment of the advances *64 was subordinated to outside creditors; the intent of the parties; and the ability of the enterprise to obtain loans from outside lending institutions. See Montclair, Inc. v. Commissioner, 318 F. 2d 38, 40; Wilbur Security Co., 31 T.C. 938, 948, affd. 279 F. 2d 657. No one of the above factors is controlling and each case rests upon its own peculiar fact situation. John Kelley Co. v. Commissioner, 326 U.S. 521; Gooding Amusement Co., 23 T.C. 408, affd. 236 F. 2d 159; Emanuel N. (Manny) Kolkey, 27 T.C. 37, affd. 254 F. 2d 51. We have already discussed our conclusions with regard to the form of the advances and the subordination of them to outside creditors. It appears to us that the execution of the interest-bearing notes was merely a convenient manner of recording the advances, and that the repayment of the advances was intended to be postponed in favor of other obligations of the venture. Moreover, petitioner's unsuccessful attempt to procure a $50,000 bank loan on behalf of the venture in connection with the two contracts indicated that the venture was unable to obtain loans *65 from outside sources. Although none of these factors standing alone is determinative of this question, we cannot believe that these funds were "advanced with reasonable expectations of repayment regardless of the success of the venture * * *." Gilbert v. Commissioner, 248 F. 2d 399, 406. On the entire record we conclude that the advances made by petitioner and those made on his behalf by A. L. Stanchfield, Incorporated, were capital contributions by petitioner placed at the risk of the venture and are properly deductible as business losses under section 165(a) and (c)(1). Larry E. Webb, 23 T.C. 1035; Harry Horner, 35 T.C. 231. However, we cannot so characterize the $15,000 advance by Palma Rekdahl to the venture, the repayment of which was guaranteed and paid under that guaranty by petitioner. The rule enunciated by the Supreme Court in Putnam v. Commissioner, 352 U.S. 82, is that a loss sustained by a guarantor who is unable to recover from the principal debtor is "by its very nature a loss from the worthlessness of a debt." Putnam v. Commissioner, supra at 85. Therefore, we must look to the provisions of section *66 166 [5] in order to determine the tax consequences of this transaction.
*67 Section 166 provides for an ordinary loss for bad debts when they are "created or acquired in connection with a trade or business of the taxpayer" and a short-term capital loss for all other bad debts. The most recent standard we have for determining whether a bad debt is of the business or nonbusiness variety is the Supreme Court's opinion in Whipple v. Commissioner, 373 U.S. 193. It appears to us that the Whipple case was quite explicit in holding that a taxpayer who lends money to a corporation in which he owns stock cannot claim that this debt was created in connection with his "trade or business" within the meaning of section 166(d)(2)(A), notwithstanding the fact that he devotes his time and energies to the affairs of the corporation. The Court was able to reach this conclusion because of a distinction it drew between the operation of a corporation's trade or business and the trades or businesses of its stockholders. The Court in Whipple, supra at 202, stated in part: Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce *68 income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself. * * * In the instant case petitioner did not own any stock in Peterson Construction Company, Inc. Rather, the relationship of petitioner and Peterson was in the nature of a joint venture. While we agree with the Whipple opinion that the trade or business of a corporation is distinct from the trades or businesses of its stockholders, we do not believe that a similar distinction can be made in the case of a partnership and its partners. We are therefore inclined to view this debt of Palma Rekdahl, payment of which was made under petitioner's guaranty, as a business bad debt, and we so hold. Montell Davis, supra; George A. Butler, supra. Since we have found the enterprise as conducted by Peterson and petitioner to be a trade or business within the meaning of the Code, we hold the $995.40 which petitioner expended for legal and accounting services in connection with *69 the two contracts to be an ordinary and necessary expense made in the course of a trade or business within the meaning of section 162(a). Because of our holding with regard to the advances and guaranty, we need not consider petitioner's alternative argument concerning a theft loss. The remaining issue in this proceeding involves petitioner's claim for an abandonment loss for 1959 in the amount of $4,060.69 on his oil lease interests located in Guadalupe County, Texas. Petitioner contends that he erroneously treated this item as a capital loss in his 1959 return and that he is entitled to an abandonment loss under section 165(a) and (c). In the computations attached to the statutory notice of deficiency for the year 1959 a capital loss of $4,060.69 was included by respondent. Petitioner raised the abandonment loss issue in an amended petition, and in an amended answer respondent denied all material allegations except that petitioner had a total adjusted basis of $4,060.69 in his oil lease interests in Guadalupe County, Texas, as of December 31, 1959. On brief respondent argues that petitioner has failed to prove that he in fact abandoned his interest in such an oil lease in 1959. *70 Petitioner replies that by this argument respondent is challenging his own determination in the statutory notice as to when this oil lease loss took place. Presumably by the terms of the statutory notice and the amended answer respondent has conceded the existence of a capital loss of $4,060.69 with respect to this issue. He cannot contend now that petitioner did not incur any loss in 1959, because that would constitute the raising of an issue on brief which is not contained in the pleadings. Merle P. Brooks, 36 T.C. 1128, 1133. However, we must still consider the propriety of petitioner's claim for an abandonment loss on his oil lease interest for the year 1959. Petitioner argues that he is entitled to an abandonment loss because the record indicates that the oil lease venture was abandoned in 1959. In support of his position petitioner cites C. C. Harmon, 1 T.C. 40, affd., 139 F. 2d 211, reversed on other grounds, 323 U.S. 44. Respondent emphasizes that there is nothing in the record to corroborate petitioner's testimony that an abandonment took place in 1959. He argues that there is no evidence as to whether the lease interest *71 in the property expired or was given up in 1959, or whether the entire tract was unsuitable for commercial oil production. Respondent maintains that one of these factors must be present to support an abandonment loss, and cites G.C.M. 3890, VII-1 C.B. 168, as authority for this proposition. Petitioner introduced in evidence three exhibits relating to this issue. They tend to establish that an oil lease operation known as the "Voss Lease" was terminated, that the equipment was sold and the proceeds from the salvage were distributed among the coventurers (one of whom was petitioner), that a well was plugged, and that certain reports were filed with the Railroad Commission as to these events. Petitioner testified to the effect that he and the other members of the group ceased to make rental payments on the oil lease after November 1959. His testimony with regard to this matter was not challenged by respondent on cross examination nor was it contradicted by any other evidence in the record. We need not reject this testimony under such circumstances merely because petitioner's own interests stand to benefit from our acceptance of it. Jay A. Williams, 28 T.C. 1000, 1001, 1002; *72 A. & A. Tool & Supply Co. v. Commissioner, 182 F. 2d 300. Hence, we have found that petitioner and his coventurers ceased to pay rent on the oil lease after November 1959. By having given up this lease he is therefore entitled to an abandonment loss in the amount of $4,060.69 for the year 1959. C. C. Harmon, supra; Harvey A. Heller, 1 T.C. 222. See also James Petroleum Corporation, 24 T.C. 509, 523; affd. 238 F. 2d 678. Decision will be entered under Rule 50. Footnotes
1. This case was heard by Judge Morton P. Fisher and briefs were duly filed. Judge Fisher died on February 11, 1965. This case, not having been disposed of, was reassinged to Judge John W. Kern on April 5, 1965, and notice was given to the parties that any request for rehearing or reargument might be presented to him within 30 days. No such requests have been received.↩
1. Computed by deducting depletion allowance, repairs, and other expenses from gross oil income.↩
2. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; (2) traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. * * *↩
3. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (b) Amount of Deduction. - For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. (c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. No loss described in this paragraph shall be allowed if, at the time of the filing of the return, such loss has been claimed for estate tax purposes in the estate tax return. * * *↩
4. There is no evidence in the record on this point with regard to the notes of Palma Rekdahl; all other notes were interest-bearing.↩
5. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts. - When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * *
(d) Nonbusiness Debts. - (1) General rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. * * *↩